Yossi **GITTER**, in the matter of Eden Moshe Gitter: infant under the age of 16, Petitioner–Appellant,

v.

Miriam **GITTER**, Respondent–Appellee.

No. 03–9299.

United States Court of Appeals, Second Circuit.

Argued: Sept. 30, 2004.

Decided: Jan. 5, 2005.

---

Erick M. Sandler, Dewey Ballantine LLP, New York, NY, for Petitioner–Appellant Yossi Gitter.

Paul M. Gamble, New York, NY, for Respondent–Appellee Miriam Gitter.

Before: LEVAL and KATZMANN, Circuit Judges [1].

KATZMANN, Circuit Judge.

This is a case of first impression in which we must interpret the phrase "habitually resident" within the meaning of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25.1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10,494 (Mar. 26, 1986) [hereinafter Hague Convention or Convention], implemented by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* (2000).

## I.

### A.

Yossi Gitter is an Israeli citizen. He was born in Yavneh, Israel and lived there until around 1995, when he moved to the United States. Miriam Gitter, his wife, also was born in Israel and maintains Israeli citizenship, but she immigrated to the United States when she was approximately three months old and maintains United States citizenship, as well.

The couple met early in 1999 in Monsey, New York, where Mrs. Gitter was living with her parents. After dating briefly, Mr. and Mrs. Gitter began cohabiting, and in May of 1999 the couple married. In December of 2000, Miriam gave birth to their son, Eden Moshe Gitter ("Eden").

Shortly after Eden's birth, Mr. Gitter proposed that the couple move to Israel. He argued that such a move would save them money and provide a better family support structure because they could live with his mother.[2] Mrs. Gitter, however, had spent very little time in Israel and was not fond of the culture, and she consequently did not want to go to Israel. However, Mr. Gitter persuaded her to try living in Israel for one year, and the family moved in March of 2001.

The Gitters made various arrangements in preparation for their move to Israel. Mr. Gitter closed their New York bank accounts, sold their cars, and placed their furniture in storage. Once the Gitters arrived in Israel, they made other arrangements consistent with the move to Israel. For example, after a few months in Israel, Mr. Gitter sold or gave the family's possessions in storage to Mrs. Gitter's sister.[3] In addition, once the Gitters arrived in Israel, they enrolled Eden in day care.

In February 2002, after about eleven months in Israel, Mrs. Gitter returned to New York with Eden to visit her sister. Mr. Gitter joined Eden and Mrs. Gitter in the United States about a week later, and

---

1. The Honorable Ellsworth Van Graafeiland, Judge, United States Court of Appeals for the Second Circuit, who was part of this panel, died following argument. The appeal is being decided by the remaining two members of the panel, who are in agreement. *See* 2d Cir. R. § 0.14(b).

2. Prior to the couple's move to Israel, they lived in Monsey, New York, close to Mrs. Gitters parents, Mr. and Mrs. Adler; however, the Gitters appear to have received little support, financial or otherwise, from the Adlers because Mrs. Gitter's relationship with her parents was strained as a result of her cohabiting with Mr. Gitter before their marriage.

3. The trial court found that "[w]hile Mr. Gitter claimed they decided to take everything out of storage and give it away because they were not going to use it, he also acknowledged that the cost of storage was a factor."

at that time Mrs. Gitter expressed a desire to remain in the United States. However, Mr. Gitter, with the aid of a trusted family friend, Lord Aristo, eventually convinced Mrs. Gitter to return to Israel by promising her that if she were still unhappy in six months, she could return to the United States.

On June 30, 2002, Mrs. Gitter again returned to the United States with Eden, purportedly on a vacation, and has not returned to Israel since then. It is unclear exactly when Mr. Gitter became aware of his wife's intentions not to return to Israel.

### B.

On July 10, 2003 Mr. Gitter filed a petition in the United States District Court for the Eastern District of New York, which sought Eden's return under the Hague Convention. The district court (Trager, J.) denied Mr. Gitter's petition after concluding that Eden's habitual residence remained the United States throughout the Gitters' stay in Israel. This appeal followed.

### II.

### A.

At the outset, we note the applicable standard of review. As we have explained before, "[t]he proper interpretation of the Hague Convention is an issue of law, which we review de novo." *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir.2001) (quoting *Croll v. Croll*, 229 F.3d 133, 136 (2d Cir.2000)) (alteration in original). "In cases arising under the Convention, a district court's factual determinations are re-viewed for clear error." *Id.* (citation omitted). However, "[t]he [d]istrict [c]ourt's *application* of the Convention to the facts it has found, like the *interpretation* of the Convention, is subject to *de novo* review." *Id.*

### B.

The Hague Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble, 51 Fed.Reg. at 10,498. The Hague Convention is primarily concerned with the "use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." Elisa Pérez–Vera, *Explanatory Report, in* 3 Conférence de La Haye de droit international privé, Actes et Documents de la Quatorzième session, Enlèvement d'enfants 426, 428, ¶ 11 (1982) [hereinafter Pérez–Vera Report].[4] The Convention was especially aimed at the unilateral removal or retention of children by those close to them, such as parents, guardians, or family members. *See* PAUL R. BEAUMONT & PETER E. MCELEAVY, THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION 1–3 (1999) [hereinafter BEAUMONT & MCELEAVY]. To deter family members from removing children to jurisdictions more favorable to their custody claims in order "to obtain a right of custody from the authorities of the country to which the child has been taken," *id.* at 429, ¶ 13, the Hague Convention

---

4. Elisa Pérez–Vera was "the official Hague Conference reporter for the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. at 10,503. "Her explanatory report is recognized by the Conference as the official history and commentary on the Convention," *id.,* and we have previously concluded that "it is an authoritative source for interpreting the Convention's provisions," *Croll,* 229 F.3d at 137 n. 3 (citation omitted).

attempts "to deprive [their] actions of any practical or juridical consequences," *id.* at 429, ¶ 16. The Convention consequently "places at the head of its objectives the restoration of the *status quo,* by means of 'the prompt return of children wrongfully removed to or retained in any Contracting State'." *Id.* Both the United States and Israel are signatories to the Hague Convention.[5] *See* Hague Conference on International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

■ A petitioner cannot invoke the protection of the Hague Convention unless the child to whom the petition relates is "habitually resident" in a State signatory to the Convention and has been removed to or retained in a different State.[6] The petitioner must then show that the removal or retention is "wrongful." Article 3 of the Hague Convention provides that:

The removal or the retention of a child is to be considered wrongful where—

a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in subparagraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3. Thus, in order to prevail on a claim under the Hague Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained

---

**5.** The United States ratified the Convention on April 29, 1988. ICARA, Pub.L. No. 100–300, 102 Stat. 445 (1988) (codified at 42 U.S.C. § 11601 *et. seq.* (2000)).

**6.** Article 4 of the Convention provides that "[t]he Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights." Hague Convention, art. 4. Other provisions of the Convention also incorporate the phrase "habitual residence" or "habitually resident." *See, e.g., id.,* art. 5 (" '[R]ights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence."); *id.,* art. 8 ("Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child."); *id.,* art. 13 ("[T]he judicial and administrative authorities shall take into ac-

count the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence."); *id.,* art. 14 ("In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child ....."); *id.,* art. 15 ("The judicial or administrative authorities of a Contracting State may ... request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention ....."); *id.,* art. 25 ("Nationals of the Contracting States and persons who are habitually resident within those States shall be entitled ... to legal aid and advice in any other Contracting State ....").

in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention. The petitioner must establish these requirements by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A).

Because the district court concluded that Eden retained the United States as his habitual residence and thus the protection of the Hague Convention could not be invoked, we must begin our analysis by considering the meaning of "habitually resident" under the Convention.

### 1.

The Hague Convention, itself, does not provide any definition of "habitually resident." *See* BEAUMONT & MCELEAVY, *supra*, at 89; *see also* Pérez–Vera Report, *supra*, at 441, ¶ 53 ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms . . . ."). We are informed, however, by the opinions of sister Circuits that have already considered the issue. *See, e.g., Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir.2003) (habitual residence to be determined by focusing on the settled purpose from the child's perspective and parental intent); *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir.2001) (habitual residence to be determined on a "case-by-case basis" after "a fact specific inquiry"); *Mozes v. Mozes*, 239 F.3d 1067, 1073–81 (9th Cir. 2001) (habitual residence to be determined by examining intentions of those entitled to fix child's residence and evidence of the child's acclimatization); *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.1995) ("[H]abitual residence is the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective.");

*Friedrich v. Friedrich*, 983 F.2d 1396, 1401–02 (6th Cir.1993) (habitual residence to be determined by reference to customary residence prior to removal and requires a change in geography and passage of time). We are also mindful that the Supreme Court has instructed the lower courts that when interpreting international conventions and treaties "the opinions of our sister signatories [are] entitled to considerable weight." *Air France v. Saks*, 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (quoting *Benjamins v. British European Airways*, 572 F.2d 913, 919 (2d Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979)) (internal quotation marks omitted). In addition, Congress has recognized "the need for uniform international interpretation of the Convention." 42 U.S.C. § 11601(b)(3)(B). We consequently consider the opinions of foreign tribunals, as well. Finally, we have the benefit of the Pérez–Vera Report, "the official history and commentary on the Convention," *Croll*, 229 F.3d at 137 n. 3, as well as other commentary, *see, e.g.,* BEAUMONT & MCELEAVY, *supra; see also Croll*, 229 F.3d at 136 ("Where the text—read in the context of its structure and purpose—is ambiguous, we may resort to extraneous tools of interpretation such as a treaty's ratification history and subsequent operation.") (citing *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982)).

We find the Ninth Circuit's opinion in *Mozes v. Mozes*, 239 F.3d 1067 (Kozinski, J.), particularly instructive. The primary insight of *Mozes* is its recognition of the importance of intentions (normally the shared intentions of the parents or others entitled to fix the child's residence) in determining a child's habitual residence. *See also Silverman*, 338 F.3d at 898 (concluding that in determining ha-

bitual residence parental intent is relevant). Judge Kozinski, writing for the Ninth Circuit, cautioned that simply observing the child's behavior was a flawed approach because "[i]t may yield strikingly different results depending on the observer's time frame." *Mozes*, 239 F.3d at 1074. Judge Kozinski explained,

> A child who spends two months at Camp Chippewah, if observed only during that period, would appear to be habitually resident there. On the other hand, if we follow the same child through to adulthood, we might label a couple of years spent studying abroad a mere "temporary absence of long duration." This indeterminancy is unavoidable . . . .

*Id.* Courts should consequently "pay close attention" to intentions. *Id.* We agree and conclude that courts should begin an analysis of a child's habitual residence by considering the relevant intentions. Focusing on intentions gives contour to the objective, factual circumstances surrounding the child's presence in a given location. This approach allows an observer to determine whether the child's presence at a given location is intended to be temporary, rather than permanent. For example, it allows an observer to distinguish between a child who went away to summer camp for a temporary duration and a child who moved permanently to a new location. In the case of the child away at summer camp, one would generally conclude that

the child has not acquired a new habitual residence. *See id.* at 1075. As *Mozes* recognized, "[t]he obvious reason why the camper is not regarded as habitually resident is that he already has an established habitual residence elsewhere and his absence from it—even for an entire summer—is no indication that he means to abandon it." *Id.* at 1074. Thus, we conclude that, generally speaking "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Id.* at 1075.

■ We specifically focus on the intent of "the person or persons entitled to fix the place of the child's residence," *id.* at 1076 (quoting E.M. Clive, *The Concept of Habitual Residence*, 1997 Jurid. Rev. 137, 144), which is likely to be the parents in most cases. True, the Hague Convention is interested in the habitual residence of only the child, *see, e.g.,* Hague Convention, art. 3 & 4, and it would therefore seem logical to focus on the child's intentions. However, as the Ninth Circuit recognized, "[c]hildren . . . normally lack the material and psychological wherewithal to decide where they will reside." *Mozes*, 239 F.3d at 1076 (internal footnote omitted).[7] Thus, it is more useful to focus on the intent of the child's parents or others who may fix the child's residence. Regardless of the evidence relied upon, the parties' intent is "a question of fact to which we defer to the district court." *Id.* at 1076.

---

7. The Hague Convention's provisions do not apply to children over the age of sixteen. Hague Convention, art. 4. In addition, the Convention creates an exception to the general rule that the petitioned State *"shall* order the return," *id.,* art. 12, of a child wrongfully removed or retained by allowing judicial and administrative authorities to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," *id.,* art. 13. Children who are neither over sixteen nor of an age and degree of maturity at which it is appropriate to take account of their views "are clearly not in a position to make independent choices as to where they wish to reside." *Mozes*, 239 F.3d at 1076 n. 23. Furthermore, because the views of a child under sixteen and who has attained an age and degree of maturity are considered in determining whether the exception to the general rule applies, it is ordinarily unnecessary to take account of the child's views when ascertaining his or her habitual residence.

In the easy case, the parents (or others entitled to determine the child's residence) will agree on where the child's habitual residence is fixed, and we are likely to conclude that the child's habitual residence is as intended. In nearly all of the cases that arise under the Convention, however, the parents have come to disagree as to the place of the child's habitual residence. It then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared. Clearly, this is a question of fact in which the findings of the district court are entitled to deference, and we consequently review those findings for clear error.

■ Once courts have resolved where the parents mutually intended the child's habitual residence to be, they have generally concluded that the child's habitual residence, in fact, accords with that parental intent. Thus, courts have generally determined that when parents have mutually intended that the child acquire a new habitual residence the child has consequently acquired a new habitual residence. *See id.* at 1077. In contrast, when the parents have mutually intended that the child not acquire a new habitual residence, courts have generally concluded that the child has not acquired a new habitual residence. *See id.* Informed by these holdings, we

will presume that a child's habitual residence is consistent with the intentions of those entitled to fix the child's residence at the time those intentions were mutually shared.

2.

■ However, parental intent cannot alone establish a child's habitual residence. First, a change in geography is a necessary condition to a child acquiring a new habitual residence. *Friedrich*, 983 F.2d at 1402. In addition, we must consider whether, notwithstanding the intent of those entitled to fix the child's habitual residence, the evidence points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted. We would be hard pressed to conclude, for example, that a child who has spent fifteen years abroad in the same State is not habitually resident there, even if the parents intended some day to return and did not intend that the child acquire a new habitual residence.[8] *See Mozes*, 239 F.3d at 1077 n. 27 ("Some periods ... though sharply delimited, may be too long to expect children to live abroad without acquiring habitual residence."); BEAUMONT & McELEAVY, *supra*, at

---

8. We are mindful that at its core, habitual residence is "a description of a factual state of affairs," *Mozes*, 239 F.3d at 1081; it is "in essence a factual concept which responds to changes in peoples' lives," BEAUMONT & McELEAVY, *supra*, at 100. The Pérez–Vera Report additionally explains that habitual residence is "a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile." Pérez–Vera Report, *supra*, at 445, ¶ 66. This does not mean that habitual residence is a factual determination made by the trier of fact to which we defer unless clearly erroneous. Rather, it is a legal precept that we review *de novo*. *See Mozes*, 239 F.3d at 1073. In addition, we note that a number of sister

Circuits, relying on this passage from the Pérez–Vera Report, have adopted the position that habitual residence differs from domicile. *See, e.g., Silverman*, 338 F.3d at 898 ("[H]abitual residence ... should not be confused with domicile."); *Friedrich*, 983 F.2d at 1401 ("We agree that habitual residence must not be confused with domicile."); *see also Mozes*, 239 F.3d at 1076 n. 21 ("The important point is that focusing on the question of settled intent to abandon a prior habitual residence in those cases where one exists does not equate habitual residence to domicile ...."). Because it is not necessary to the disposition of this case, we simply note that we neither accept nor reject that precept at this time.

94 ("[I]t would be difficult to affirm that whatever an individual's alleged intention he should not be connected to a country that has been his place of residence over a period of years."). An analysis of the evidence of acclimatization allows courts to take account of the fifteen years spent abroad.

▰ As the *Mozes* court observed:

[A] child *can* lose its habitual attachment to a place even without a parent's consent. Even when there is no settled intent on the part of the parents to abandon the child's prior habitual residence, courts should find a change in habitual residence if "the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." The question in these cases is not simply whether the child's life in the new country shows some minimal "degree of settled purpose," but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child "out of the family and social environment in which its life has developed."

*Mozes*, 239 F.3d at 1081 (citation omitted); *see also* E.M. Clive, *supra*, at 140 (noting that "[i]f at the relevant moment a person has been living in one country … for a sufficiently long period" "questions as to the purpose of the residence become irrelevant").

▰ As *Mozes* cautions, however, courts should be "slow to infer" that the child's acclimatization trumps the parents' shared intent. *Mozes*, 239 F.3d at 1079. The object of the Convention is to dissuade parents and guardians from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle. Permitting evidence of acclimatization to trump evidence of earlier parental agreement could "open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit." *Id.*

In relatively rare circumstances, however, it is possible that the child's acclimatization to the location abroad will be so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence. As noted earlier, a child who has spent fifteen years abroad, for example, would predictably suffer severe harm if returned to the state he had experienced only at birth. In such circumstances the likelihood that the child would be harmed from the deprivation of his acclimatized life in the new residence might overcome the showing that the parents' last shared intent was to return to the original domicile. The child's acclimatization might thus "point unequivocally" to a change in his habitual residence. *Id.* at 1081.

### III.

▰ In sum, we conclude that in determining a child's habitual residence, a court should apply the following standard: First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

## IV.

We now turn to the facts of this case. Consistent with the first prong of the legal standard we have articulated, the district court properly considered whether Mr. and Mrs. Gitter mutually intended that Eden acquire Israel as his habitual residence. See *Gitter v. Gitter*, No.03–CV–3374, 2003 WL 22775375, at *3, 2003 U.S. Dist. LEXIS 21015, at *9 (E.D.N.Y. Nov. 20, 2003). The district court determined that there was no "settled mutual intent to make Israel Eden's permanent home," [9] *Gitter*, 2003 WL 22775375, at *4, 2003 U.S. Dist. LEXIS 21015, at *10. We cannot conclude that the district court's findings were clearly erroneous. The district court found that Mr. and Mrs. Gitter "only mutually agreed to move to Israel on a conditional basis—namely, that Mrs. Gitter would be satisfied with the new arrangements." *Gitter*, 2003 WL 22775375, at *4, 2003 U.S. Dist. LEXIS 21015, at *10. In reaching this conclusion, the court credited Mrs. Gitter's testimony that the move to Israel was only temporary and of a trial nature. *Gitter*, 2003 WL 22775375, at *3, 2003 U.S. Dist. LEXIS 21015, at *7. In addition, the district court reviewed other evidence of parental intent:

> Although Mr. Gitter did point to some indicators tending to suggest their stay in Israel might be of indefinite duration, this evidence only suggests that Mr. Gitter himself never had any intention of returning to live in New York. He emphasized that he closed their U.S. bank accounts and opened Israeli accounts, sold their cars in N.Y. and leased a new car in Israel, gave away their furniture that had been in storage and bought new furniture in Israel, and spent considerable time and money on renovations to his mother's house. I find he took these actions while telling his wife they could move back to New York if she wanted to do so after a trial period. These actions can not be read as reflective of Mrs. Gitter's intentions or the Gitters' mutual agreement.

*Gitter*, 2003 WL 22775375, at *4 n. 3, 2003 U.S. Dist. LEXIS 21015, at *11 (internal citations omitted). In light of the district court's determination that Mrs. Gitter's testimony was more credible, we cannot conclude that the district court was clearly erroneous in its conclusion that this evidence only reflected Mr. Gitter's intentions and that Mrs. Gitter only intended to move to Israel conditionally.

However, as we explained above, the shared intent of the parents is not dispositive of a child's habitual residence. A court must additionally examine the evidence to determine if it unequivocally points to the child having acclimatized and thus acquired Israel as his habitual residence.[10] We express no view whether the circumstances in which Eden lived in Israel support a finding that his habitual residence changed from the United States to Israel, or whether his parents' last shared

---

9. We assume that the district court used the phrase "permanent home" to mean "habitual residence."

10. The district court never reached this issue. It ended its analysis after considering Mr. and Mrs. Gitter's subjective intentions, having applied the following erroneous legal standard: "Because the Convention seeks to prevent one parent from unilaterally determining in which country the child will live, habitual residence can not be shifted without mutual agreement." *Gitter*, 2003 WL 22775375, at *3, 2003 U.S. Dist. LEXIS 21015, at *9; *see also id.* ("[C]ourts have generally turned to the mutual subjective intent of the persons entitled to fix the child's residence.") (citing *Mozes*, 239 F.3d at 1076). As we have explained above, habitual residence *can* shift without mutual agreement if " 'the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place.' " *Mozes*, 239 F.3d at 1081 (quoting *Zenel v. Haddow*, 1993 S.L.T. 975, 979

intent that his habitual residence be in the United States should control.

## V.

 The district court did not know at the time of its decision the legal standard by which this court would adjudicate Hague Convention disputes. We accordingly remand to permit the district court to consider the facts explicitly in light of this opinion.

If the district court decides that the facts justify a different conclusion on the question of habitual residence, it should then reconsider whether these proceedings have been commenced within a year,[11] and if not, whether Eden is now settled in the United States.[12] The court is at liberty to vacate and amend its judgment. In contrast, if the court concludes its judgment will not be changed by consideration of the standard espoused in this opinion, it should so state, leaving its judgment unaffected. If the court sees fit in either case to add explanations, it is welcome to do so. In any case, the district court should advise us of its conclusion.

This panel will retain jurisdiction of the appeal and await the district court's re-

port. In view of the urgency of proceedings of this nature, we encourage the district court to deal promptly with the question.

The mandate shall issue at once. FED. R. APP. P. 2.

---

(Scot. 1st Div.)); *see also id.* at 1082–83 (noting, after reviewing the trial court's findings of the objective facts, that the these facts "do not point unequivocally to the conclusion that, at the time [the mother] petitioned for [the children's] custody, the children had ceased to be habitually resident in Israel").

11. The district court already addressed this issue and concluded that Mr. Gitter did not commence these proceedings within a year of the alleged wrongful retention or removal. *Gitter*, 2003 WL 22775375, at *4, 2003 U.S. Dist. LEXIS 21015, at *13. The court concluded that Mr. Gitter was aware that Mrs. Gitter intended to retain Eden in New York before July 10, 2002, because Mrs. Gitter went to the police on that date to complain that he had threatened her. In so finding, the court may have misjudged the date of the police report, which indicates that Mrs. Gitter

went to the police on July 11, to report a phone call that took place *on* July 10 rather than *before* July 10. If necessary, the district court may reconsider the question and determine when the allegedly wrongful retention of Eden in the United States took place.

12. Article 12 of the Convention provides that if the proceedings have been commenced "less than one year ... from the date of the wrongful removal or retention, the authority concerned *shall* order the return of the child forthwith"; however, "even where the proceedings have been commenced after the expiration of the period of one year," judicial or administrative authorities "*shall* ... order the return of the child, *unless it is demonstrated that the child is now settled in its new environment.*" Hague Convention, art. 12 (emphasis added).