**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIMITRIS PAPAKOSMAS,
               *Plaintiff-Appellant,*

v.

YVETTE PAPAKOSMAS,
               *Defendant-Appellee.*

No. 05-55211

D.C. No.
CV-04-06726-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
February 8, 2007—Pasadena, California

Filed April 16, 2007

Before: Diarmuid F. O'Scannlain, Edward Leavy, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

Adair Dyer, Austin, Texas, argued the cause and filed a brief for the plaintiff-appellant.

Elizabeth Briceño-Velasco, Arcadia, California, argued the cause and filed a brief for the defendant-appellee. Vincent W. Davis, Arcadia, California, was also on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

   We must decide whether the children of Dimitris and Yvette Papakosmas were habitual residents of Greece within

the meaning of the Hague Convention on the Civil Aspects of International Child Abduction and therefore wrongfully removed from that country to the United States by their mother.

I

A

The following facts emerged during an evidentiary hearing on November 23 and 24, 2004, before the district court, U.S. District Judge Margaret Morrow presiding. Dimitris and Yvette Papakosmas were married in Las Vegas, Nevada, on August 20, 1994, and subsequently resided in the Los Angeles, California area. The couple have two children together, a son, born on March 6, 1995, and a daughter, born on December 29, 1997; both children were born in Los Angeles. Mr. and Mrs. Papakosmas owned and operated two hotels in Hollywood, the Liberty Hotel and the Hollywood International Hotel, and leased and operated a third hotel, the Hollywood International Youth Hostel.

In December 2003, the Papakosmas family left California for Greece, the birthplace of Dimitris. At the evidentiary hearing, he testified that the couple had always discussed the possibility of moving to Greece, but had made the ultimate decision in April or May of 2002, after the September 11 attacks resulted in a negative effect upon the hotel business. In October 2003, Dimitris completed the sale of the couple's two hotels, the Liberty and the Hollywood International. Yvette asserts that she learned only in November 2003 that one of the hotels had been sold, never learning of the other sale until the family was in Greece. Dimitris also asked Yvette to sign a quitclaim deed on a property owned by the couple in Malibu, conveying her interest to Dimitris in full. After Yvette executed the deed, Dimitris promptly sold the property. In addition, in the months leading up to the move, Yvette began selling or disposing of the couple's furniture

and also sold the family dog, although she contends that such sale was unrelated to the move but instead a result of the dog's behavior problems.

The family arrived in Greece on December 20 or 21, 2003, and spent the Christmas holiday with Dimitris' family in Orei, located three hours from Athens. On January 6, 2004, they went to Athens, where Dimitris had rented an apartment. On January 23, 2004, Yvette returned to California to check on the management of the hostel and to make a lease payment. Dimitris contends that Yvette's trip was to deal with a bounced check and to return a passport to her son from a previous marriage.

Upon returning to Greece on February 3, 2004, Yvette learned from her daughter that Dimitris' alleged mistress from the United States, Slima Boudour, was also in Greece. Dimitris concedes that he had a "one-night stand" with Boudour, but denies that she was his mistress. Before Judge Morrow, Yvette testified that she considered leaving Greece after Dimitris refused to send Boudour home, but that she could not because Dimitris controlled the children's passports and her own. Yvette contacted the United States Embassy, which advised her to seek legal representation in Greece.

On February 14, 2004, in Athens, Yvette's wrist was cut and she was hospitalized. Yvette contends that Dimitris cut her after she refused to accede to his wish that Boudour be allowed to live in the apartment with the family. Dimitris testified at the evidentiary hearing, and a Greek doctor also offered medical testimony, that Yvette's wound was self-inflicted. After Yvette was released from the hospital, she hired an attorney and succeeded in getting a restraining order from the Greek courts. Meanwhile, Dimitris moved the family's belongings from the Athens apartment to a new apartment in Orei. Yvette's restraining order dissolved after three days, at which time she returned to the United States Embassy seeking assistance. After the Embassy conducted its own

investigation, it determined that it would help Yvette and gave her plane tickets and passports. On April 23, 2004, she and the children left Greece for the United States.

B

On August 12, 2004, Dimitris instituted this action under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.*, ("ICARA"), in the United States District Court for the Central District of California seeking the return of the children to Greece.[1] Following the evidentiary hearing noted above, on December 31, 2004, the district court filed an order denying Dimitris' petition.

In its order, the district court first concluded that Dimitris and Yvette agreed to move to Greece on a conditional basis, and therefore determined that there was no shared, settled intent to abandon their habitual residence in California. Next, Judge Morrow concluded that at no time after their arrival in Greece did they form such a settled intent. Finally, the district court concluded that the "objective facts do not point unequivocally to the conclusion that Greece had become the children's new habitual residence." Accordingly, because the court determined that Dimitris had failed to meet his burden of proving that Greece is the children's habitual residence, it found that Dimitris could not establish a prima facie case for wrongful removal and dismissed the action. Dimitris filed a timely notice of appeal.

---

[1]On May 6, 2004, Yvette filed a Petition for Dissolution of Marriage in Los Angeles Superior Court and obtained a temporary restraining order against Dimitris. Dimitris contests jurisdiction in that case, which is stayed pending the outcome of these proceedings.

## II

## A

The Hague Convention on the Civil Aspects of International Child Abduction is intended to prevent "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." *Mozes v. Mozes*, 239 F.3d 1067, 1069 (9th Cir. 2001) (citing Elisa Perez-Vera, Explanatory Report, ¶ 11, *in* 3 Hague Conference Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982)). The Convention has been implemented by Congress through the ICARA, 42 U.S.C. § 11601, *et seq.* The Convention's focus is not the underlying merits of a custody dispute but instead whether a child should be returned to a country for custody proceedings under that country's domestic law. *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004) (*Holder II*).[2]

**[1]** Under Article 3 of the Convention, the removal or retention of a child is "wrongful" where:

---

[2]Because the Hague Convention does not decide the merits of the custody dispute, any resolution of the merits must await the final outcome of a petition filed under the Convention. Thus, "[t]he judicial or administrative authorities of Contracting States *shall act expeditiously* in proceedings for the return of children." Hague Convention, art. 11, 19 I.L.M. 1501, 1502 (1980) (emphasis added). Our court recognized the Convention's concern with resolving disputes in an expeditious manner in *Holder v. Holder*, 305 F.3d 854, 871 (9th Cir. 2002) (*Holder I*) (internal citations omitted).

This proceeding has been anything but expeditious. We accept some of the responsibility as a court for the delay of nearly two years between the district court decision and our scheduled oral argument. However, a degree of responsibility must also fall upon Dimitris and his attorney. Our circuit rules allow parties to file "motions to expedite" which "will be granted upon a showing of good cause." Fed. R. App. P. 27-12. Counsel for Dimitris acknowledged at oral argument that he was aware of this provision, but chose not to file such a motion.

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the Child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3, 19 I.L.M. at 1501. In *Mozes*, we stated that a court applying this provision must answer four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention? 239 F.3d at 1070; *see also Von Kennel Gaudin v. Remis*, 282 F.3d 1178, 1182 (9th Cir. 2002).

**[2]** As was true in *Mozes*, the district court here denied Dimitris' petition based on its answer to the second question: it found that as of April 23, 2004, the children's "habitual residence" was in the United States and not Greece. Although the term "habitual residence" is intentionally left undefined in the Convention, we have developed an analytical framework to provide "intelligibility and consistency" in the determination of a child's habitual residence. *Holder II*, 392 F.3d at 1015 (citing *Mozes*, 239 F.3d at 1071). Thus, in determining whether a child has acquired a new habitual residence, we first ask whether there is a settled intention to abandon a prior habitual residence. *Mozes*, 239 F.3d at 1075. In this inquiry, "the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." *Id.* at 1076 (citing E.M. Clive, *The Concept of Habitual Residence*, 1997 Jurid. Rev. 137, 144). Here,

as in most cases, those persons are the parents. *See Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (looking to "the parents' present, shared intentions regarding their child's presence").

**[3]** The parents' settled intention is not alone sufficient to change a child's habitual residence. *Mozes* counsels that such a transformation also requires (1) an actual change in geography, and (2) the passage of an appreciable period of time, one sufficient for acclimatization. 239 F.3d at 1078. Importantly, "[h]abitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent." *Id.* at 1081 (emphasis in original). Thus, even when the settled intent of a child's parent is not clear, a district court should "find a change in habitual residence if 'the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place.' " *Id.* (citing *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)).

B

As a threshold matter, Dimitris asserts that the standard of review of a district court's judgment on an ICARA petition is de novo. We have previously stated that a determination of habitual residence under the Hague Convention is a mixed question of law and fact. *Mozes*, 239 F.3d at 1073; *see also Feder*, 63 F.3d at 222 n.9; *Ruiz v. Tenorio*, 392 F.3d 1247, 1251-52 (11th Cir. 2004) (adopting mixed standard of review). Under this standard, "we accept the district court's historical or narrative facts unless they are clearly erroneous, but exercise plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." *Mozes*, 239 F.3d at 1073 (citing *Feder*, 63 F.3d at 222 n.9). The question of whether there is a settled intention to abandon a prior residence is a question of historical fact "as to which we defer to the district court." *Id.* at 1076.

In *Holder II*, we acknowledged "the flexible, fact-specific nature of the habitual residence inquiry envisioned by the Convention." 392 F.3d at 1015. Nonetheless, we stated that "[d]espite the factual focus of our inquiry, our conclusion rests on a legal determination: After scrutinizing the circumstances of a particular case, we must determine whether the discrete facts add up to a showing of habitual residence." *Id.* In making this legal determination, we must be mindful that we are interpreting a treaty, and that uniformity and consistency of interpretation is our goal. *See Mozes*, 239 F.3d at 1072 ("To achieve the uniformity of application across countries, upon which depends the realization of the Convention's goals, courts must be able to reconcile their decisions with those reached by other courts in similar situations.").

Thus, our proper function is not to engage in a full de novo review; instead, we are to determine whether, giving appropriate deference to the district court's findings of fact and credibility determinations, the evidence adds up to a showing of habitual residence. *Holder II*, 392 F.3d at 1015.

## III

### A

Dimitris first contends that the district court erred in its conclusion that there was no mutual settled intention between Yvette and Dimitris to abandon their prior residence in California. Such conclusion "is a finding of historical fact entitled to review under the clearly erroneous standard." *Ruiz*, 392 F.3d at 1254 (citing *Mozes*, 239 F.3d at 1077).

[4] The district court made three key credibility determinations in reaching its conclusion. First, it found that Yvette's account of the family's move to Greece and subsequent events was credible. Second, it found that Dimitris' account was not credible and that he had lied or misrepresented significant facts, including facts related to the couple's disposition

of property. Finally, the district court found the testimony of key third parties, such as Yvette's mother, the children's teachers, and the hostel manager, Mazam Mazzal, to be credible and supportive of Yvette's claim of conditionality. These credibility determinations are supported by the record, and therefore were not clear error. *See United States v. Lang*, 149 F.3d 1044, 1046 (9th Cir. 1998) (reviewing credibility determinations under a clear error standard); *Ruiz*, 392 F.3d at 1254 (upholding district court's finding of no shared intent to abandon United States as a habitual residence where, among other things, "the court expressly credited [the wife's] mother who testified that [the husband] had promised that if it did not work out in Mexico, they would come back to the United States").

**[5]** In particular, the district court's finding on Dimitris' lack of credibility is supported by the fact that he lied about the date he entered into a two-year lease extension on the hostel property. He alleged that the decision to move to Greece was made by mutual agreement in April or May of 2002. However, Mazzal, the property manager of the hostel, testified that he witnessed Dimitris sign a two-year lease for the property on May 1, 2003. In addition, while Dimitris testified at the hearing that he never signed such an extension, the leasing document with Dimitris' signature was entered into evidence.

**[6]** The district court's credibility finding is also supported by the circumstances surrounding Yvette's execution of a quitclaim deed on the Malibu property. Although Dimitris testified that this legal maneuver was performed so that only he would need to return from Greece when the company wanted to sell the property, he actually sold the property less than a week after Yvette's signature. Yvette testified that she did not learn of the sale of the property until she returned to the United States in April 2004. The logical inference from this sequence of events is that Dimitris was attempting to sell the Malibu property without Yvette's knowledge. If the couple

had agreed to sell their stateside property before they moved to Greece, then the execution of a quitclaim deed a mere seven days before the sale of the property was an unnecessary step.[3]

## B

**[7]** Nor do the objective facts surrounding the family's departure for Greece particularly support Dimitris' version of events such that it was clear error for the district court to find that Yvette intended the move to be conditional. The court found the cards written by Dimitris Jr.'s classmates to be ambiguous at best and, in many cases, supportive of Yvette's contention that the move was temporary. It also found the lack of a going away party to be an additional factor disproving Dimitris' testimony. Finally, and perhaps most importantly, the district court did not err in concluding that the Papakosmas family intended to continue doing business in the United States. The court accepted as credible the testimony of Yvette that she returned to the United States early in 2004 to make lease payments on the hostel and to check on the business. The existence of such payments was corroborated by Mazzal. The ongoing business venture in the United States and Yvette's trip back are objective factors weighing in favor of a finding that there was no mutual intent to abandon completely the family's residence in California.

## C

We are particularly sensitive to our duty to strive for uniform interpretation of the provisions of a treaty. *See* 42 U.S.C.

---

[3]In his briefs on appeal, Dimitris advances an argument that he had not raised before the district court, namely that because Yvette filed a petition for a restraining order and for sole custody of the "family home" in Greek courts, she is precluded from arguing that the family's move to Greece was conditional. Because this judicial estoppel argument was not raised in the district court, we deem it waived. *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985).

§ 11601(b)(3)(B) (stating that in enacting ICARA, Congress recognized "the need for uniform international interpretation of the Convention"). As part of our mixed standard of review under *Mozes*, therefore, we consider whether the district court's ultimate conclusion that there was no shared settled intention on the part of the parents to shift the children's habitual residence is consistent with the body of treaty law under the Hague Convention. Such consideration is intended to further the goal of "intelligibility and consistency" of application that *Mozes* quite correctly identified as a crucial purpose of the treaty. 239 F.3d at 1072.

**[8]** We are satisfied that the district court's conclusion that the family's move to Greece was "conditional" is consistent with the reasoning of other courts interpreting the Convention. The Eleventh Circuit's recent decision in *Ruiz v. Tenorio* is particularly on point, as the district court itself recognized. 392 F.3d at 1249. In that case, Melissa Tenorio and Juan Ruiz decided, after seven years in the United States, to move to Mexico "[i]n an attempt to save the marriage." *Id.* at 1249. Juan testified that he intended the family to move permanently, while Melissa and a third-party testified that the move was on a trial basis. *Id.* The Ruiz family started out in Mexico living with Juan's family, but eventually moved into an apartment and even began building an "American-style" house. *Id.* at 1249-50. As in this case, there was evidence that the couple continued to fight in Mexico and that Melissa returned with the children to the United States twice during the 34 months that the family lived in Mexico. *Id.* at 1250. The district court determined that there was no shared intention between Juan and Melissa to make Mexico their permanent residence; instead, Melissa had agreed to the move on a conditional basis only. In reaching its decision, the district court in that case, as did the district court here, expressly credited the testimony of the mother and family members who testified on the mother's behalf. Relying upon these credibility findings, as well as the objective facts indicating Melissa's conditional intent, the

Eleventh Circuit found no clear error in the district court's conclusion and affirmed. *Id.* at 1254.

The Second Circuit's decision in *Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005), is also instructive. There, Yossi and Miriam Gitter, along with their son Eden, moved from New York to Israel, the birthplace of both parents. Yossi Gitter argued that the move would save them money and provide a better family support structure because they could live with his mother in Israel. *Id.* at 128. The couple closed bank accounts, placed their furniture in storage, and moved to Israel. *Id.* After well over a year, Miriam returned to the United States with Eden and resolved to stay. The district court determined that there was no settled mutual intent to make Israel Eden's permanent home because Miriam Gitter had agreed to the move only on a conditional basis. *Id.* at 135. The Second Circuit affirmed, holding that the district court's findings were not clearly erroneous. *Id.* It acknowledged that Yossi Gitter did point to certain evidence suggesting that their stay might be indefinite, including the closing of bank accounts and the sale of furniture that had been placed in storage. *Id.* Nonetheless, the court concluded that "[i]n light of the district court's determination that Mrs. Gitter's testimony was more credible, we cannot conclude that the district court was clearly erroneous in its conclusion that this evidence only reflected Mr. Gitter's intentions and that Mrs. Gitter only intended to move to Israel conditionally." *Id.*

Dimitris contends, however, that the district court's finding of a conditional move was legal error because the "condition" upon which the move was made was too vague. As support, he points to the Third Circuit's decision in *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). There, the court reversed the district court and found that the child's habitual residence was in Australia. But that court first determined that the parents "both agreed to move to that country and live there with another and their son." *Id.* at 224. The Third Circuit found that given such apparent settled intention, the district

court had relied too heavily on Mrs. Feder and her intention not "to remain in Australia permanently if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work." *Id.*

Our reading of *Feder*, however, suggests that the objective factors indicating a shared intent on the part of the couple were demonstrably stronger than they are here. In *Feder*, the family purchased and renovated a house in Australia, both parents pursued social interests and employment in Australia (he with a bank, she with an opera house), and arranged for their child's short and long-term schooling there. *Id.* In addition, the family all received Australian medicare cards, allowing them access to state-sponsored healthcare. *Id.* at 220. Further, before the move to Australia, Mr. Feder had taken photographs of new houses there and sent them to his wife to get her input on which house to purchase. The couple ultimately purchased a new home prior to moving to Australia. Thus, unlike in the present case, the Feders had agreed mutually to sell their house in the United States, to purchase a new house in Australia, and to seek employment and integration there.

The objective facts here, coupled with the district court's credibility determinations, distinguish *Feder* and instead make this case quite comparable to *Ruiz-Tenorio* and *Gitter*. The district court here found, and the record supports, that Dimitris was selling the couple's American property out from under Yvette and without her knowledge; that the couple had no set employment in Greece; that the couple continued to operate a business in the United States; that the family had not purchased nor even sought out a permanent home in Greece; and that Yvette had not sought employment or otherwise integrated into Greek society. The district court, as did the court in *Ruiz-Tenorio*, also relied upon key third-party testimony of Yvette's mother, the children's teachers, and the hostel manager, to establish that Yvette had not agreed to discard fully the family's residence in California.

**[9]** Accordingly, because the district court's credibility determinations and findings as to intent are supported by the record, and because the ultimate decision comports with prior precedent under ICARA and the Hague Convention, there was no error in finding that there was no mutual settled intention on the part of the parents to shift the habitual residence of their children from California to Greece.

IV

Such conclusion does not end our inquiry. Under *Mozes*, we must also consider whether objective facts establish that the children's habitual residence had changed from California to Greece. 239 F.3d at 1078. In performing this inquiry, we are mindful that in "the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Id.* at 1079.

A

The district court found that the objective facts did not point unequivocally to the conclusion that Greece had become the children's habitual residence. The court noted that the children attended English-speaking schools because they did not speak or write Greek. The district court also considered it relevant that the children did not have "anything resembling a permanent home during their four months in Greece." The family first stayed at Dimitris' parents home in Orei, then in a rented apartment in Athens, and finally at an apartment in Orei. In addition, the district court noted that the evidence showed that the couple's son was not adapting well to his new environment, and often had headaches and crying fits. Finally, the court noted that Yvette took one trip back to California and tried to leave with the children again after less than two months. Thus, the court concluded that based upon objective factors, the roughly four-month period was not sufficient to allow the children to acclimate to their surroundings in such a way as to change their habitual residence to Greece.

B

**[10]** It is possible that a child's acclimatization to the location abroad will be so complete that serious harm can be expected to result from compelling his return to the family's intended residence. *Gitter*, 396 F.3d at 134. *Holder II* cautions that acclimatization should not be confused with acculturation; the question more generally is whether Greece had supplanted California as the locus of the children's development. 392 F.3d at 1019. We conclude that the district court did not err in determining that the children's stay in Greece did not shift the locus of their development and that any acclimatization did not overcome the absence of a shared settled intention by the parents to abandon the United States as a habitual residence.

**[11]** The children's life in Greece appears to have been in a permanent state of flux. After their arrival, they went to Orei to stay with Dimitris' family. After the holidays, the family went to Athens to stay in a rented apartment. There, the children began attending English-speaking schools. There is no evidence that the parents ever considered a Greek language institution. Ultimately, after only a few months in Athens, Dimitris determined to move the family again back to Orei, this time to a new apartment. Thus, in less than four months, the record establishes that the children lived in three different homes; in addition, unlike the families in *Ruiz* and *Feder*, there was no action by the parents to purchase their own home.

Further, though the precise nature of their relationship is a matter of dispute, there is no doubt that the presence of Slima Boudour, Dimitris' mistress, exacerbated the tensions between Yvette and Dimitris at home. After Yvette returned from her trip to the United States, she learned from her daughter that Boudour had arrived in Greece and had spent time in the family's apartment. The mysterious presence of Boudour in the lives of the Papakosmas family supports the district

court's conclusion that as a unit, the family's life in Greece was anything but stable. Indeed, the deterioration in the children's well-being was seen through Yvette's mother's testimony, expressly credited by the district court, that the son suddenly seemed moody, irritable, and often engaged in bouts of crying for no apparent reason.

**[12]** Finally, we note that although the passage of time itself is not dispositive on the issue of acclimatization, it is instructive that the children spent nearly all of their lives in the United States, spoke little Greek, and had visited the country only three or four times for two to three weeks at a time. With the irregular set-up of their household in Greece, four months was an insufficient time for the children to "develop[ ] deep-rooted ties to the family's new location." *Holder II*, 392 F.3d at 1021; *see also Mozes*, 239 F.3d at 1078 ("[H]ome isn't built in a day. It requires the passage of an appreciable period of time . . . When the child moves to a new country accompanied by both parents, who take steps to *set up a regular household together*, the period need not be long. On the other hand, when circumstances are such as to hinder acclimatization, even a lengthy period spent in this manner may not suffice.") (emphasis added)).

**[13]** The facts here are such that we cannot "say with confidence that the [children's] relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the [children] out of the family and social environment in which [their] life has developed." *Mozes*, 239 F.3d at 1081 (internal quotations omitted).

V

**[14]** In sum, we agree with the district court that there was no shared settled intention on the part of the parents to shift the habitual residence of their children to Greece. We also agree with the district court that the four-month period spent

by the children in Greece was insufficient to acclimatize them to that country. We therefore conclude that on the date of the children's removal from Greece, their habitual residence remained in the state of California and accordingly, their mother's removal of them from Greece was not wrongful within the meaning of the Hague Convention and ICARA. The judgment of the district court is

**AFFIRMED.**