HON. WILLIAM F. KUNTZ, II, UNITED STATES DISTRICT JUDGE
Gábor Zsolt Mohácsi ("Petitioner") brings this case against Isabella Sofia Rippa Herrera[1] ("Respondent") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. (formerly codified at 42 U.S.C. § 11601 et seq. ). Petitioner seeks an order from this Court requiring the immediate return of his son NIR to Hungary, who is *300 now approximately four years old. For the reasons discussed below, the petition is DENIED.
PROCEDURAL HISTORY
On May 1, 2018, Petitioner filed a petition seeking the return of a child to Hungary pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq. (formerly codified at 42 U.S.C. § 11601 et seq. ). Petition at 1-2, ECF No. 1. The Petition generally alleges Respondent, NIR's mother, wrongfully removed NIR to and has retained NIR in the United States in violation of Petitioner's paternity rights under Hungarian law.
On May 1, 2018, Judge Kiyo Matsumoto, the presiding Miscellaneous Duty Judge at the time, issued an Order to Show Cause directing, inter alia , that neither Respondent nor anyone else remove NIR from the jurisdiction of this Court, and also directing the U.S. Marshals to serve Respondent with a copy of the Petition and take Respondent's and NIR's passports into custody for safekeeping. ECF No. 4. On May 4, 2018, pursuant to Petitioner's request, ECF No. 5, Judge Matsumoto extended the time for Petitioner to serve Respondent. See May 4, 2018 Electronic Order. On May 10, 2018, in light of Petitioner's May 9, 2018 letter requesting an extension of time to serve Respondent because of difficulties locating Respondent, ECF No. 9, this Court entered an order further extending the time for service and also extending the time for Respondent to respond to the Petition. ECF No. 10. On May 18, 2018, Petitioner informed this Court that the U.S. Marshals served Respondent with the petition on May 16, 2018[2] and seized the passports of NIR and Respondent. ECF No. 12 (letter); ECF No. 13 (certificate of service). Pursuant to a May 23, 2018 order issued by Magistrate Judge Robert Levy, the Court directed the U.S. Marshals to deposit the passports of Respondent and NIR with the Clerk of Court for safekeeping. ECF No. 14.
On June 15, 2018, Respondent, through her newly-retained counsel, filed an answer to the petition. Answer, ECF No. 18. Respondent admitted, inter alia . NIR was born in Hungary on September 19, 2014, she is a parent of NIR, and she lived with Petitioner for roughly two years in Budapest, id. at 3, but generally denied the remaining allegations in the petition. Respondent asserts seven defenses and argues the petition should be dismissed for the following reasons: (1) Petitioner cannot show NIR was habitually resident in Hungary; (2) Petitioner cannot show NIR was wrongfully removed; (3) Petitioner does not reside in Hungary and cannot exercise his parental rights in Hungary; (4) Petitioner consented and/or acquiesced to NIR's removal by Respondent from Hungary; (5) Petitioner never exercised custody rights; (6) there is a grave risk NIR's return would expose NIR to physical or psychological harm or otherwise place NIR in an intolerable situation; and (7) these proceedings were: not initiated until more than one year after NIR's removal and NIR is well-settled in his new environment. Id. at 11-13.
On June 20, 2018, this Court held its first conference in this case. See June 20, 2018 Minute Entry. The Court directed the parties to submit a pre-hearing briefing *301 schedule and scheduled an evidentiary hearing for July 23 and 24, 2018. Id. On. June 28, 2018, this Court so-ordered the briefing schedule proposed by the parties. ECF No. 21. On July 9, 2018, both parties filed their pre-hearing briefs. Pet.'s Pre-Hr'g Br., ECF No. 23; Resp.'s Pre-Hr'g Br., ECF No. 24. On July 13, 2018, both parties filed reply briefs in opposition. Resp.'s Pre-Hr'g Reply Br., ECF No. 28; Pet.'s Pre-Hr'g Reply Br., ECF No. 29. On July 17, 2018, Petitioner filed a motion in limine , ECF No. 31, and on July 18, 2018, the parties filed a joint proposed pre-trial order, ECF No. 33. On July 20, 2018, Petitioner filed a supplemental memorandum of law in support of his motion in limine to exclude the testimony of Respondent's psychological expert, Dr. B.J. Cling. ECF No. 35 (memorandum of law); ECF No. 36 (declaration in support). On July 20, 2018, this Court denied Petitioner's motion in limine. See July 20, 2018 Electronic Order. Also on July 20, 2018, this court held a pre-hearing conference to address outstanding issues including witnesses testifying abroad, and rescheduled the evidentiary hearing for July 24 and 25, 2018 at the parties' request.[3] See July 20, 2018 Minute Entry.
On July 24 and 25, 2018, this Court held an evidentiary hearing. See July 24 & 25, 2018 Minute Entries. At the conclusion of the evidentiary hearing, this Court set a schedule for post-hearing briefs. In accordance with that schedule, on August 10, 2018, both parties filed post-hearing briefs and proposed findings of fact. Pet.'s Post-Hr'g Br., ECF No. 39; Pet.'s Proposed Findings of Fact, ECF No. 40; Resp.'s Post-Hr'g Br., ECF No. 42; Resp.'s Proposed Findings of Fact, ECF No. 43. On August 17, 2018, both parties filed reply briefs in opposition. Pet.'s Post-Hr'g Reply Br., ECF No. 45; Resp.'s Post-Hr'g Reply Br., ECF No. 46.
FINDINGS OF FACT[4]
A full chronology of events follows below, but this Court begins with certain facts Petitioner has admitted. Petitioner admitted he physically assaulted Respondent during their relationship on more than one occasion. Hearing Transcript ("Tr.") 50:16-51:1, ECF Nos. 49-50. During one incident in 2012, Petitioner testified he hit Respondent during a sexual encounter with another individual because Respondent kissed the third individual. Tr. 50:16-23. Petitioner indicated this was against the "rules" and it hurt his feelings. Tr. 50:21-23. During another incident, Petitioner admitted he "slapped" Respondent. Tr. 50:24-51:1. In reality, this incident involved much more than a slap. As Respondent explained in testimony which this Court credits, Petitioner nearly choked her to death. Tr. 136:2-137:6. In an August 2014 incident, Petitioner admitted he was drunk and showed up at Respondent's mother's apartment-where Respondent was living at the time and was approximately eight months pregnant-and threw a rock through a window, breaking the glass. Tr. 53:15-56:6. Petitioner admitted he could be heard on a recording of the incident in which he was verbally abusive to Petitioner, and among other threats, he stated "[i]f I am not there at the birth of my child, you're gone, you're history!" Tr. 117:4-6, 168:17-18; Ex. G at HERRERA_0000274_T at 5:44. Petitioner acknowledged he was sentenced to community service as a result of this incident. Tr.
*302 55:13-55:24. When asked if he would meet NIR at the airport if this Court ordered NIR's return, Petitioner stated it depended on his work schedule and whether he was in Hungary at the time. Tr. 121:14-23. When asked where NIR would live if this Court ordered his return to Hungary, Petitioner admitted he "can't take [his] son," who only knows Respondent and does not know Petitioner. Tr. 125:24-126:9.
Petitioner admitted he videotaped himself and Respondent having sex with other people "all the time," and stated only he and Respondent had access to the videos, which he uploaded to YouTube. Tr. 49:2-22. As the documentary evidence in this case reflects, Petitioner repeatedly used these videos to threaten and harass Respondent. Petitioner posted screenshots of these videos, including pornographic images of Respondent, on various Facebook accounts, which Respondent reported to the Budapest police. See, e.g. , Ex. C; Ex. L. In one email to the Budapest Police, Respondent wrote that Petitioner "stores compromising photos and porn videos of me, on which I was visibly drugged by him. At last I escaped his clutches. But he continuously sends screenshots of these porn videos to my birth father, my mother's current husband. He sends them to me, too. His goal is to alienate everybody from me, so he can beat me at his pleasure and make me continue to take drugs and be a whore." Ex. F at HERRERA_0000194 - 0000195_T. Petitioner admitted sending pornographic photos of Respondent to Respondent's father. Tr. 100:14-101:5, 106:12-107:4; Ex. C at HERRERA_0000108; Ex. AC at HERRERA_0000462.
Respondent presented testimony from a psychological expert, Dr. B.J. Cling, which this Court credits. For approximately thirty years, Dr. Cling's area of expertise has been domestic violence, harm against women, child abuse, and sexual harassment. Tr. 303:2-10. Dr. Cling has written a book titled "Sexualized Violence Against Women and Children: The Psychology and Law Perspective" and has presented lectures, given trainings, and taught courses in the field. Tr. 303:13-305:5. In addition to maintaining her own clinical psychology practice, Dr. Cling is a professor in the psychology department at John Jay Criminal Justice and supervises psychology interns at Columbia Presbyterian Hospital. Tr. 301:9-302:6. Dr. Cling holds a J.D. from UCLA Law School and a Ph.D. from New York University. Tr. 302:8-23. Petitioner did not present expert testimony from a psychologist or mental health professional.
Dr. Cling testified that based on her psychological examination of Respondent, Respondent suffers from post-traumatic stress disorder (PTSD) related to her relationship with Petitioner. Tr. 308:7-15, 310:5-311:23. Dr. Cling testified Respondent's PTSD symptoms had lessened, but she still suffers from mild PTSD and had recently experienced a resurgence of some symptoms. Tr. 311:1-10. Dr. Cling testified that Respondent experienced PTSD in the three essential domains of symptoms. Tr. 311:24-313:16. Dr. Cling opined that Respondent "was very credible, psychologically speaking." Tr. 311:22.
Dr. Cling testified that if NIR returned to Hungary with Respondent, NIR would be at risk. Tr. 314:1-3. Dr. Cling explained that for children who observe their mother being abused, "it is like direct child abuse of [the children]" and is very serious. Tr. 315:1-8. She testified there is empirical research indicating that perpetrators of domestic violence are fifty percent more likely "to engage in continued harassment of the woman, the victim, and also their children." Tr. 315:9-17. Dr. Cling testified to her belief that Petitioner's harassment and abuse of Respondent would likely continue *303 and create a risk of harm for NIR. Tr. 314:3-21. Dr. Cling testified that based on Petitioner's previous interactions with Respondent after NIR's birth-described in more detail infra -Petitioner displayed a "certain disregard of [NIR]," which contributed to Dr. Cling's assessment of the risk of harm to NIR in Hungary. Tr. 331:10-20.
In her written report, Dr. Cling stated "[t]here is an extreme risk that Mr. Mohacsi's abuse of Ms. Herrera would continue-and even intensify-should she return to Hungary with NIR.... Were NIR to witness first-hand the type of abuse that Mr. Mohacsi has inflicted on his mother in the past, NIR would face a substantial risk of developing psychological symptomatology." Ex. BN at 9. Dr. Cling stated "NIR acts and speaks like a typical American child. His behavior indicates that he is in a stable situation, well cared for, and emotionally comfortable." Id. at 8. Dr. Cling wrote that "re-exposing NIR's mother to Mr. Mohacsi would have a strong negative effect on NIR himself.... Forcing Ms. Herrera to return [to Hungary] would have a psychologically damaging effect on her, which in turn would cause great harm to NIR, who depends on her as his main emotional support." Id. Dr. Cling's written report concluded: "The high likelihood of both (1) Mr. Mohacsi's abuse of Ms. Herrera if she and NIR return to Hungary, and (2) NIR's development of a psychological disorder should he witness such abuse, combine to create grave risk of harm to NIR." Id. at 9.
When questioned on cross-examination about her assessment of Petitioner despite not having the opportunity to interview him, Dr. Cling stated her evaluation of Petitioner was more general than specific. Tr. 319:22-321:12. Dr. Cling explained her assessment of the probability of Petitioner's future abuse of Respondent was based on several psychological risk factors, including that as a past perpetrator of domestic violence directed at Respondent, Petitioner is "extremely likely to continue to want to harass and control her." Tr. 324:7-24. Moreover, Dr. Cling testified "a perpetrator who is generally obsessed with control increases [his] attempts when the victim flees or attempts to escape," and "speaking statistically, [Petitioner is] likely to be an abuser in the future and also likely to abuse his child." Tr. 324:25-325:13.
Dr. Cling testified that based on her evaluation of NIR, he was a well-adjusted boy who had an excellent relationship with Respondent. Tr. 309:19-310:4. Dr. Cling opined that NIR was well-adjusted in the United States based on NIR's comfort and happiness, his knowledge of English, various references NIR made to American television, and NIR's enrollment in school. Tr. 321:13-322:6. Dr. Cling testified NIR seemed adjusted to the American culture in which he has grown up. Tr. 322:7-25. When asked whether messages Respondent sent to Petitioner in April 2017 in which she expressed a desire for Petitioner to get to know NIR and to move back to Hungary undermined her findings, see Ex. 10 at MOHACSI0000536, Dr. Cling testified the messages did not affect her assessment of Respondent's PTSD because, among other reasons, most victims of domestic abuse have difficulty leaving their perpetrators. Tr. 326:10-331:2. Dr. Cling testified it is "unusual for a specific thing to completely undermine a psychological understanding of someone." Tr. 330:22-25.
To the extent Petitioner and Respondent offered conflicting accounts of events, this Court credits Respondent's testimony and finds Respondent to be a believable witness. Much of the documentary evidence supports her testimony and she generally answered questions directly, did not appear evasive, and carried herself in a *304 similar manner on both direct and cross-examination. Petitioner, on the other hand, was defensive and at times aggressive on cross-examination. In some instances, Petitioner appeared to be simply lying. For example, Petitioner claimed that a text exchange from June 2018 between him and a former partner, Timea Arnoth, in which Ms. Arnoth denied receiving any child support from Petitioner despite Petitioner's assertion that he "currently supports his two other children in Hungary," see Petition at 2, was a fake exchange created to trick Respondent. Tr. 65:2-77:3; Ex. BH. Although Petitioner denied having any communications with Ms. Arnoth about this case, Tr. 82:17-23, Petitioner admitted Ms. Arnoth submitted a statement to his lawyers in response to this very text exchange (in which he demanded that Ms. Arnoth "write down you bastard that I never laid a finger on my children," see Ex. BH at HERRERA_0000819 - 0000828_T at June 21, 2018, 23:03). Tr. 80:19-23; Ex. 17. In other testimony and documents submitted to this Court, Petitioner stated he lives in Hungary, see Tr. 83:7-8; Petition at 2, but the documentary evidence indicates otherwise, see Ex. X at HERRERA_0000451; Ex. BG at HERRERA_0000857. In addition, despite being confronted with screenshots of his YouTube account showing pornographic images of Petitioner and Respondent, Petitioner refused to acknowledge it was his account notwithstanding the documentary evidence indicating it was. Tr. 96:1-17; Ex. AD at HERRERA_0000473. Accordingly, where there are factual disputes between the parties' accounts, this Court credits Respondent's testimony.
Petitioner and Respondent met in June 2012 in Budapest, Hungary at a photoshoot arranged by Respondent's mother. Tr. 13:1-14, 130:20-24. Respondent's mother had contacted Petitioner via Facebook because he was a professional photographer. Tr. 13:3-14. Petitioner and Respondent started dating right away, and Respondent moved in with Petitioner within a few weeks after they met. Tr. 13:15-18, 131:3-5. At the time they started dating, Respondent was nineteen years old and Petitioner was thirty-eight years old. Tr. 131:22-25. Respondent had never had a sexual relationship with anyone before she started dating Petitioner. Tr. 131:18-21. Petitioner, on the other hand, had two children from a prior relationship: a daughter, now age fifteen and a half, and a son, now age eleven and a half. Tr. 10:6-19, During the two years Respondent and Petitioner were together, Petitioner spent only a few days with his other children. Tr. 263:24-264:8.
After Petitioner and Respondent had been dating for a few weeks, their relationship began to deteriorate. Tr. 132:1-3. Respondent explained Petitioner "became mad at times" with her and accused her of being "a fake, liar, and actress[ ] bitch." Tr. 132:5-8. After moving in with Petitioner, Respondent became aware of his alcohol consumption, and testified he consumed alcohol on a daily basis, including beer, vodka, scotch, and wine. Tr. 132:9-23. Respondent testified Petitioner consumed at least five or six beers a day. Tr. 132:14-18. Petitioner also used ecstasy. Tr. 132:24-133:3. After they had been living together for a few weeks, Petitioner began pressuring Respondent to have a sexual encounter with another man, which made Respondent uncomfortable. Tr. 133:4-18. Respondent refused, but Petitioner continued his requests every day, and Respondent continued to say no. Tr. 133:13-24, 137:23-25. The requests continued every day during the summer and fall of 2012. Tr. 137:23-25. When Respondent refused, Petitioner became angry and accused her of "bring[ing] him down." Tr. 133:23-25, 141:24-142:6.
*305 One evening in September 2012, Petitioner invited another man-a drug dealer of Petitioner, Tr. 140:21-24-to their apartment and told Respondent he wanted her to have sex with him. Tr. 138:1-13. Respondent initially refused, but Petitioner told her she "[had] to have sex with [the man]." Tr. 138:20-25. Petitioner told her approximately twenty times that night to have sex with the other man, and she refused approximately ten times. Tr. 140:2-6. Respondent testified she felt like she had nowhere else to go that night because she was very drunk and could not use her phone to call anyone because Petitioner had previously broken it. Tr. 140:7-20. After Petitioner's repeated demands, she had sex with the other man. Tr. 139:1. Petitioner videotaped the encounter and uploaded the video to his YouTube channel. Tr. 140:25-141:5. The next day, Petitioner forced Respondent to watch the video during sex as a "punishment" and told her she was a "nasty bitch." Tr. 141:10-14.
Respondent discovered messages in which Petitioner attempted to set up another encounter. Tr. 143:1-144:12; Ex. U at HERRERA_0000377_T. During another sexual encounter in November 2012, Respondent ended up in the hospital after taking ecstasy. Tr. 144:13-19. With respect to this November 2012 incident, Respondent testified that although her memory of what happened is not very good, she remembers that she, Petitioner, and a third man were naked, and Petitioner "aggressively" fed her an ecstasy pill using his fingers and gave her beer to swallow it. Tr. 144:20-145:10, 146:4-10. This happened after Respondent had already taken ecstasy "through [her] nose" earlier that day at Petitioner's urging. Tr. 144:22-145:4. Respondent remembered waking up on her back and Petitioner was in her mouth and the third individual was videotaping the encounter. Tr. 145:11-13. Prior to that night, Respondent testified she had never taken drugs before and Petitioner was aware of that fact. Tr. 146:14-18.
As Petitioner admitted, he physically assaulted Respondent during their relationship. Tr. 50:16-17. During one incident at the end of the summer of 2012, Petitioner logged into Respondent's Facebook account and discovered a message that made him upset and he "gave [Respondent] a few slaps to [her] face and then he took [her] arm, he grabbed [her] arm, he pulled it, and then he pushed [Respondent] to the floor and he gave [Respondent] one more slap." Tr. 134:14-135:2. During this incident, Petitioner called Respondent a "bitch." Tr. 135:3. On another occasion-also around the end of the summer of 2012-Petitioner pushed Respondent to the floor and choked her with both of his hands after Petitioner discovered a Facebook message intended for Respondent. Tr. 136:2-19. Respondent testified she could not breathe and told him to stop or it would be "too late." Tr. 136:13-16. Respondent clarified she believed she might die if he did not stop. Tr. 136:24-137:6. During this incident, Petitioner called her a bitch and accused her of cheating on him. Tr. 136:20-23. He also broke her phone and laptop computer. Tr. 136:17-19.
In late 2012, Respondent became pregnant. Tr. 146:19-20. Petitioner was initially happy about the pregnancy and told Respondent he would change his lifestyle. Tr. 147:3-13. But in late December 2012, Petitioner became angry and told Respondent he did not want her to keep the baby. Tr. 147:14-24. Specifically, Respondent testified Petitioner returned home from a party at a nearby pub and threw a milk carton from the fridge against a wall in anger. Tr. 147:20-148:9. The next day, Respondent's mother came over and Respondent gave her money. Tr. 148:13-24. This upset Petitioner and he locked Respondent out of the apartment later that night even though *306 Respondent was one month pregnant and the weather was "freezing cold." Tr. 148:23-149:10. In response to Respondent's requests to be let back in the apartment or for a blanket, Petitioner initially allowed her to return only until the next morning, but the next day "[Petitioner] acted like nothing happened." Tr. 149:12-23.
At her mother's urging, Respondent had an abortion in February 2013 in Italy, where her father lived, because Respondent was concerned of possible complications with the baby due to her previous drug overdose. Tr. 150:2-19. Respondent told Petitioner of her plan to have an abortion the day she went to the hospital for the procedure, and Petitioner did not want her to have the abortion. Tr. 150:20-151:2. Petitioner accused Respondent's father of murdering his child and threatened to kill Respondent's father. Tr. 151:6-12. Petitioner coordinated with a friend of his who worked for a gossip newspaper to create an article stating Petitioner was looking for Respondent who had purportedly gone missing, and Petitioner was afraid Respondent might have had an abortion. Tr. 151:15-153:20; Ex. BM. Respondent returned to Hungary in March 2013, and Petitioner picked her up at the airport and acted "calm," "nice," and "caring." Tr. 154:15-19. The next day, Petitioner became upset about the abortion, so Respondent left him and went to his mother's apartment. Tr. 154:23-25. The following morning, Petitioner went to his mother's apartment and "was very mad and aggressive" and slapped Respondent "very hard" several times. Tr. 155:1-11.
Despite this incident, Respondent began living with Petitioner again. Tr. 155:16-19. Respondent testified she was afraid that if she did not live with Petitioner again, he would use the sexually explicit videos he recorded to "destroy everything around [her]" by sending the videos to her parents, her friends, and any potential future boyfriend "so ho could destroy the relationship." Tr. 155:22-156:11. Respondent was also afraid that if she left Petitioner to try to find a job, Petitioner would send the videos to her new employer. Tr. 156:12-15. When asked why she believed Petitioner would do this, Respondent explained she had heard Petitioner drunkenly say that when his ex-partner, Ms. Arnoth, asked for child support for their children, he threatened to send a video of Ms. Arnoth to Ms. Arnoth's employer. Tr. 156:16-157:5. During the fall of 2013, Petitioner continued to ask Respondent to have sex with other men "[a] few times a week." Tr. 157:6-13.
In December 2013, Respondent became pregnant with NIR. Tr. 19:3-5, 160:14-15. Initially, Petitioner was happy about the pregnancy. Tr. 19:6-8, 160:19-22. Petitioner testified they looked for a new apartment in which to raise NIR in Budapest and made other preparations for NIR's birth when Respondent was approximately five months pregnant. Tr. 21:25-22:12. Respondent, however, testified that during her pregnancy, she wanted to raise NIR in New York and never intended to raise NIR in Hungary from his birth. Tr. 170:19-23, 225:6-8. Respondent booked tickets to travel to the United States at the end of the summer of 2014, but ultimately did not travel to the United States at that time. Tr. 171:5-16. While Respondent was pregnant with NIR, Petitioner continued to ask her to have sex with other men, and in February 2014, Respondent gave in to his requests. Tr. 161:7-22. Petitioner recorded the encounter and uploaded it to his YouTube channel. Tr. 161:25-162:5.
Later, after they broke up, Petitioner made the private videos of sexual encounters involving Respondent-which were previously only available to him and Respondent, Tr. 49:17-22-publicly available. Tr. 172:25-173:10. After she left Petitioner, *307 Respondent received harassing messages on a daily basis from several Facebook accounts containing screenshots of these videos, Tr. 173:11-16, and Petitioner sent Respondent screenshots of the videos "to remind [her] what a nasty and worthless bastard" she was, Tr. 173:3-4. In December 2014, Respondent sent an email to the Budapest Police attaching pornographic screenshots of several of the Facebook accounts that contacted her. Tr. 174:10-175:1; Ex. C.
Both parties agree they had an argument in June 2014 that effectively ended their relationship, Tr. 22:24-23:2, 162:22-23, but their accounts of what led to the argument differ. Petitioner's testimony regarding what led to the argument is not altogether clear. Petitioner testified Respondent received a phone call from her father, who was upset after viewing a photo Petitioner uploaded to Facebook of Petitioner kissing Respondent's stomach while she was visibly pregnant. Tr. 23:5-27:12; Ex. 2. Petitioner testified Respondent's father was upset because her father did not want her to have the baby.[5] Tr. 25:20-25. Petitioner testified he told her to leave. Tr. 24:3-9. Respondent, on the other hand, testified that she became mad at Petitioner because of a woman for whom he had been doing a free photoshoot, and she could not stand him anymore after everything he had done to her.[6] Tr. 163:1-8. Petitioner, who was "a little drunk," spat in her face several times and threatened to throw a professional photography light at her, and she left. Tr. 163:9-23. Respondent went to her mother's apartment, where she lived after moving out from living with Petitioner. Tr. 27:13-15, 163:24-164:3, 254:21-255:2. Respondent returned briefly to Petitioner in July 2014, but left that same night after discovering the underwear of another woman in Petitioner's apartment. Tr. 28:4-12, 164:12-165:7.
Respondent next saw Petitioner on August 20, 2014, when he showed up at her mother's apartment. Tr. 53:12-18, 165:19-166:5. Petitioner admitted he was drunk and upset. Tr. 53:22-23. Respondent called the police, who told Petitioner to leave, and he left. Tr. 166:2-5. Petitioner returned later that night and threw a rock through a window, shattering the window. Tr. 166:23-167:8. Respondent called the police again, who came, but by that time Petitioner had left. Tr. 167:7-8. Respondent recorded a portion of Petitioner's interaction that night with her and her mother during which Petitioner was verbally abusive and, among other threats, stated "[i]f I am not there at the birth of my child, you're gone, you're history!" Tr. 167:9-12, 168:17-170:18; Ex. G at HERRERA_0000274_T at 5:44. Petitioner acknowledged he was sentenced to community service as a result of breaking the window, Tr. 55:18-24, and Petitioner acknowledged it was his voice on the recording, Tr. 117:4-6.
NIR was born in Budapest, Hungary on September 19, 2014. Tr. 28:16-20, 171:17-18; Joint Proposed Pre-Trial Order at 2, ECF No. 33. Petitioner was not listed as NIR's father on NIR's birth certificate. Tr. 171:19-21. Within a few days of NIR's birth, Petitioner went to Respondent's building with police officers to see the *308 baby. Tr. 31:15-32:11, 172:1-14, 229:11-18. Respondent told Petitioner and the police that Petitioner had no right to see the baby, and the police agreed. Tr. 172:7-20. During this encounter, Petitioner acted aggressively and Respondent believed he was drunk. Tr. 172:21-24. Respondent described Petitioner as acting in a manner that was "too nasty for [the] meeting of a newborn baby." Tr. 172:22-24.
Approximately two months after NIR's birth, Petitioner filed a paternity lawsuit in Hungary to establish his parental rights. Tr. 33:6-14. Respondent appeared for the first proceeding in March 2015 with her lawyer and described Petitioner as behaving aggressively and noted he appeared drunk. Tr. 177:9-17. The judge instructed Petitioner that if he could not behave, he would be brought out of the courtroom.[7] Tr. 177:18-23, 262:11-263:3. Respondent admitted she did not appear for DNA testing even though she received notice of dates to appear for the testing. Tr. 193:7-12, 231:23-232:1. Respondent also admitted she did not appear at subsequent court proceedings despite subpoenas ordering her to appear. Tr. 230:3-9. Although Petitioner informed the court and the police of his belief that Respondent intended to leave Hungary with NIR, the court did not inform Respondent she could not leave Hungary with her son. Tr. 177:24-178:5, 261:16-25, 267:2-14; Ex. A at HERRERA _0000003_T; Ex. BT at MOHACSI_0000191. Respondent did not have any issues obtaining a passport for NIR without Petitioner's consent. Tr. 262:1-3. Petitioner told Respondent that if it turned out NIR was not his son, he would kill her. Tr. 178:6-9.
In early 2015, Petitioner continued to send harassing messages to Respondent. Tr. 184:16-19. In one message, Petitioner stated, "[y]ou either let me see my son or I will destroy you and you will end up in jail with your mother, but maybe your rather as well." Tr. 188:3-15; Ex. W at HERRERA_0000412 - HERRERA_0000450_T. In addition, Respondent continued to receive messages from Facebook accounts containing pornographic images of her taken from the sexually explicit videos Petitioner had filmed. Tr. 194:1-196:8; Ex. L; see also Ex. O (Facebook account containing photo album with hundreds of pornographic images of Respondent). Respondent reported the messages to the Budapest Police in June 2015. Tr. 195:2-6, 265:1-9; Ex. L; Ex. O. Respondent was unable to receive a protective order because she and Petitioner no longer lived together. Tr. 265:10-13. Petitioner testified he has a good relationship with a police commander, who brought him documents related to the complaints Respondent made to the police about Petitioner. Tr. 122:20-123:25.
After appearing in court in March 2015 in connection with Petitioner's paternity suit, Respondent saw Petitioner in person several times before leaving Hungary for the United States. Tr. 201:1-4. On one occasion, Respondent was with NIR at a bank. Tr. 201:5-8. Petitioner walked into the bank and acted aggressively, and Respondent testified she believed he was drunk. Tr. 201:9-12. Respondent asked security to call the police because Petitioner refused to let her leave. Tr. 201:13-16. On another occasion in the summer of 2015, Petitioner went to Respondent's mother's lake house and was drinking beer nearby.
*309 Tr. 201:21-202:4. Respondent testified she was scared by Petitioner's presence because she knew he had been waiting for her there. Tr. 202:2-4. On several other occasions, Petitioner showed up near Respondent's apartment. Tr. 202:14-20.
On August 25, 2015, Respondent left with NIR for the United States. Tr. 202:21-23; Joint Proposed Pre-Trial Order at 2. Respondent arrived in New York, where her mother's husband lived at the time and still currently lives. Tr. 203:5-10. Respondent testified that when she left, she did not intend to return to Hungary to raise NIR there, and has not considered going back to Hungary since coming to the United States.[8] Tr. 203:19-24, 223:10-12. To date, since arriving in New York, Respondent has not left. Tr. 204:2-4. Respondent's father sends money to Respondent on a monthly basis and financially supports her and NIR; the amount he sends her has fluctuated but gradually increased to $1,000.00 per month. Tr. 204:15-22, 250:19-24. Respondent lived at several locations in New York before she met Carlos Herrera in October 2015, whom she met by posting an ad on Craigslist looking for a room. Tr. 204:23-206:2. Mr. Herrera was fifty-eight years old at the time and was an American citizen. Tr. 205:15-16, 206:21-22. Respondent initially rented a room from Mr. Herrera in October 2015, and they married after living together for eight months. Tr. 206:5-25. Respondent stated she married him because he was "very nice" to her and had a good relationship with NIR, and because of his status as an American citizen, which could change her immigration status and NIR's immigration status. Tr. 207:17-208:1. Mr. Herrera passed away in May 2017 because of health complications related to kidney disease and a heart attack. Tr. 218:23-219:6.
In June 2016, the Hungarian court issued a decision declaring Petitioner the father of NIR.[9] Ex. 4; Tr. 38:20-21. After the court order, Petitioner was able to change NIR's birth certificate to reflect his paternity. Tr. 39:5-40:22; Ex. 3. Petitioner tried to see NIR, but he learned Respondent had left for New York with NIR. Tr. 40:23-41:23. Petitioner went to the Ministry of Justice of Hungary to try to initiate NIR's return, and on March 30, 2017, the Ministry of Justice of Hungary sent a letter to the United States Department of State in connection with Petitioner's application. Tr. 43:7-19; Ex. 5. On October 1, 2017, Petitioner completed a "Request for return of a child wrongfully removed abroad," which was filed with the United States Department of State, the Hague Convention Central Authority for the United States, in October 2017. Ex. 6; Petition at 5; Decl. of Brent L. Andrus in Supp. of Pet.'s Pre-Hr'g Br. ¶ 7, ECF No. 25. On October 20, 2017, the United States Department of State sent a letter to Respondent, informing her of Petitioner's application. Tr. 44:21-45:6; Ex. 7.
*310 Respondent and NIR are both currently permanent residents of the United States, having applied in August 2016. Tr. 209:6-8, 210:5-13, 219:15-17, 220:5-7; Ex. AH; Ex. AK. NIR has health insurance through Medicaid. Tr. 211:9-12. Respondent and NIR were evicted from the home they shared with Mr. Herrera and currently live in a family center where they have a large room, private bathroom, and kitchenette; they have now lived there for several months. Tr. 220:19-221:7, 251:10-21. NIR has his own bed and Respondent stated she feels "safe and secure" in their current residence, where they are permitted to stay for up to one year. Tr. 221:8-17. NIR's primary language is English, and he speaks only a "few words" of Hungarian. Tr. 221:18-23. He has friends in New York and now attends school. Tr. 222:3-8; Ex. BD. Respondent testified that NIR loves New York and is excited about going to school. Tr. 257:16-22. Petitioner has continued to threaten Respondent since she has been in New York. Tr. 217:8-218:22; Ex. Z.
Both parties presented testimony from Hungarian law experts. Respondent's Hungarian law expert, Dr. Blanca Illés-whose testimony this Court credits-testified Petitioner became a father by court order. Tr. 275:16-19. Dr. Illés explained there are four methods by which paternity can be established under Hungarian law: court order, wedlock, a special human reproduction procedure, and an acknowledgement of paternity. Tr. 276:12-17. She testified that the only applicable method in this case is the first method, i.e. , a court order. Tr. 277:8-11. In Hungary, an unmarried father has no legal custodial rights before paternity is established, and an engagement between the parties does not grant an unmarried father any additional rights. Tr. 277:17-20. Regarding the date upon which Petitioner acquired paternity rights, Dr. Illés testified that even though Exhibit 4-the court order at issue-bears a date of June 16, 2016, see Ex. 4 at MOHACSI_0000520, the court order did not become legally binding and final until September 2, 2016, because of Hungarian legal rules governing the time for appeals and finality of certain court orders. Tr. 277:21-288:4. Accordingly, Dr. Illés testified that Petitioner became the father of NIR on September 2, 2016, once the court order became final. Tr. 288:22-289:1.
When asked about the date upon which Petitioner's parental rights became final, Petitioner's Hungarian law expert, Dr. Orsolya Szeibert, acknowledged the court order was not final on June 16, 2016 due to the time for appeals. Tr. 340:3-342:5. Dr. Szeibert testified she was "not sure about the exact calculation according to the procedural civil code," Tr. 342:1-3, and while she "would like to say early July is correct" regarding when Petitioner's parental rights vested, she acknowledged she did not know the applicable rules, Tr. 346:7-348:3.
Dr. Illés testified that under Hungarian law, Respondent would have been legally permitted to leave Hungary for the United States in August 2015 because, at that time, Respondent was the sole custodial parent, and the pendency of the Hungarian court paternity proceeding did not change the analysis. Tr. 288:14-289:1. Dr. Illés explained that during a paternity case, a father does not have parental rights, Tr. 288:22-23, and Dr. Szeibert acknowledged that prior to the Hungarian court's order, Petitioner had no parental or custodial rights under Hungarian law, Tr. 343:2-4, 349:8-23. Moreover, Dr. Illés testified that under Hungarian law, paternity orders from a court do not have retroactive effect. Tr. 289:2-289:8. Dr. Szeibert ultimately agreed. Tr. 351:13-352:2. Dr. Illés testified that once a paternity decision becomes final, a father would have to start a second procedure to determine visitation, child *311 support, and custody, and this second procedure usually takes two or three years, although it is possible to request temporary visitation, which can be obtained within three months. Tr. 290:24-291:14. Dr. Illés testified that while a paternity case is pending, the court before which the case is pending does not have any custodial rights, nor does a trustee appointed to represent the interests of the child. Tr. 292:1-9.
Although Dr. Szeibert testified that parental rights include custody rights, Tr. 338:18-19, 339:11-12, 343:16-22, other parts of her testimony indicate there is a separate procedure to enforce those rights. For example, she testified that once there is a judgment establishing paternity, "you are the father of the child, and you have parental rights," but for "access to the child," the father would need to "arrange it" either by agreement or by a court order. Tr. 348:23-349:7; see also Tr. 350:7-19.
APPLICABLE LAW
"The [Hague] Convention [on the Civil Aspects of International Child Abduction] was adopted in 1980 in response to the problem of international child abductions during domestic disputes." Abbott v. Abbott , 560 U.S. 1, 8, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010). "The Convention seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.' " Id. (quoting Convention, art. 1, attached as Ex. A to the Petition, ECF No. 1-2). "The Convention was especially aimed at the unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." Gitter v. Gitter , 396 F.3d 124, 129 (2d Cir. 2005) (citation omitted). The Convention "seeks to 'protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence.' " Blondin v. Dubois , 189 F.3d 240, 244-45 (2d Cir. 1999) (" Blondin I ") (quoting Convention, preamble). "The United States is a contracting state to the Convention; and Congress has implemented its provisions through the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, 42 U.S.C. § 11601 et seq. "[10] Abbott , 560 U.S. at 5, 130 S.Ct. 1983.
"By operation of the Convention, a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." Blondin I , 189 F.3d at 245 (citations and quotation marks omitted); Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). "The removal or the retention of a child is to be considered wrongful where - (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, art. 3; see Gitter , 396 F.3d at 130. "The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3; see Gitter , 396 F.3d at 130.
*312 Accordingly, "to prevail on a claim under the Hague Convention a petitioner must show that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention [or would have been exercising those rights but for the removal or retention]." Gitter , 396 F.3d at 130-31 ; Hofmann v. Sender , 716 F.3d 282, 291 (2d Cir. 2013) (quoting Gitter , 396 F.3d at 130-31 ). "The petitioner must establish these requirements by a preponderance of the evidence." Gitter , 396 F.3d at 131 (citing 42 U.S.C. § 11603(e)(1)(A), now codified at 22 U.S.C. § 9003(e)(1)(A) ).
"[D]etermining the child's country of habitual residence is a threshold issue in nearly all Hague Convention cases, because the laws of that country determine the custody rights recognized by the Convention." Guzzo v. Cristofano , 719 F.3d 100, 108 (2d Cir. 2013) (citing Convention, art. 3). Although the Convention does not define "habitually resident," the Second Circuit has provided the following guidance:
First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.
Gitter , 396 F.3d at 134. While "[i]n the easy case, the parents (or others entitled to determine the child's residence) will agree on where the child's habitual residence is fixed .... [i]n nearly all of the cases that arise under the Convention, however, the parents have come to disagree as to the place of the child's habitual residence. It then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared," which "is a question of fact in which the findings of the district court are entitled to deference." Id. at 133 ; see also Delvoye v. Lee , 329 F.3d 330, 333 (3d Cir. 2003) ("[W]here [a conflict between the parents] is contemporaneous with the birth of the child, no habitual residence may ever come into existence.").
Even where the parents' shared intent can be ascertained, "[i]n relatively rare circumstances, however, it is possible that the child's acclimatization to the location abroad will be so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence." Gitter , 396 F.3d at 134 ; see Guzzo , 719 F.3d at 108 ("[A] child's habitual residence changes when the child becomes settled in another country, even if one or both of the parents intend for the child to return to the original country of habitual residence." (citing Gitter , 396 F.3d at 133-34 ) ). The Second Circuit has described the inquiry as akin to asking: "[W]ould returning the children ... be tantamount to sending them home?" Guzzo , 719 F.3d at 108 (citation omitted). "The question in these cases is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether we can say with confidence that the child's relative attachments to the two countries have *313 changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." Gitter , 396 F.3d at 134 (quotation marks and citations omitted). The Second Circuit has cautioned: "courts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent" because "[p]ermitting evidence of acclimatization to trump evidence of earlier parental agreement could 'open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit.' " Id. (quoting Mozes v. Mozes , 239 F.3d 1067, 1079 (9th Cir. 2001) ); accord Mota v. Castillo , 692 F.3d 108, 116 (2d Cir. 2012) ("It would frustrate the objectives of the Convention if a parent or guardian could secure an advantage in an anticipated custody dispute merely by whisking the child away to a foreign land, and retaining her there long enough to amass evidence of the child's acclimatization to the new location." (citing Gitter , 396 F.3d at 134 ) ).
Courts are not entirely in agreement regarding whether the time a child spends in another country should be considered in determining acclimatization when one parent alleges the child's retention in or removal to that country is wrongful. Compare Lachhman v. Lachhman , 08-CV-4363, 2008 WL 5054198, at *1-2, *6 (E.D.N.Y. Nov. 21, 2008) (Sifton, J.) (considering time the child spent in the United States after being taken there from the United Kingdom in determining whether the child had acclimatized to the United States despite petitioner's claim the child's removal to the United States was wrongful), with Ordonez v. Tacuri , 09-CV-1571, 2009 WL 2928903, at *6 n.8 (E.D.N.Y. Sept. 10, 2009) (Block, J.) ("The Court is mindful that it would be inappropriate to consider the period of time after the alleged wrongful removal in the acclimatization analysis, as this could reward the [allegedly] abducting parent for the time during which the child was [allegedly] wrongfully retained or removed." (quotation marks and citation omitted) ); see also Diorinou v. Mezitis , 237 F.3d 133, 142 & n.10 (2d Cir. 2001) (acknowledging the district court's recognition that "a parent cannot create a new habitual residence by the wrongful removal and sequestering of a child," but declining to decide "whether the effect of an initial wrongful removal or retention could be dissipated by an unchallenged residence in the country of retention for an extended period of time" (citing, inter alia , Convention, art. 12) ); Duran-Peralta v. Luna , 16-CV-7939, 2017 WL 6596632, at *8 (S.D.N.Y. Dec. 22, 2017) (Rakoff, J.) (finding it would be inappropriate to give more than "marginal weight" to the roughly two years the child spent in the United States in considering whether the child had acclimatized to the United States when petitioner argued the removal to the United States was wrongful); Kijowska v. Haines , 463 F.3d 583, 588-89 (7th Cir. 2006) ("By failing to pursue his legal remedy, [the father] enabled [the child] to obtain a habitual residence in the country to which her mother took her, even if the initial taking was wrongful.").
In Redmond v. Redmond , the respondent took her then eight-month old child from Ireland to the United States on November 10, 2007, after her relationship with the child's father, the petitioner, deteriorated. 724 F.3d 729, 731 (7th Cir. 2013). The petitioner filed a petition for guardianship and custody rights in an Irish court on March 25, 2008 (while the respondent and child were physically present in Ireland, having returned for a visit), which the Irish court ultimately granted years later on February 10, 2011. Id. at 733-34. In determining the child's habitual residence, *314 the Seventh Circuit looked at the time the child had spent in the United States as of March 30, 2011-the date upon which the child's continued retention was alleged to be wrongful and in violation of the Irish court's order-and stated that while "a parent cannot create a new habitual residence by the wrongful removal and sequestering of a child ... [respondent's] removal of [the child] from Ireland was not wrongful, so giving weight to the substantial duration of the child's residence in the United States does not undermine the purposes of the Convention." Id. at 743 (quotation marks and citations omitted); cf. id. at 749 ("My colleagues recognize that time in Illinois would not count toward habitual residence if [the mother's] unilateral removal of [the child] from [the father's] custody had violated Irish law." (Easterbrook, C.J., dubitante opinion) ). The Seventh Circuit concluded the child was habitually resident in the United States as of the date of the alleged wrongful retention. Id. at 747.
With respect to the second Gitter element-whether the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence-"a federal court looks to the law of the child's place of habitual residence to determine whether a petitioner possessed lawful rights of custody at the time of a child's removal." Norden-Powers v. Beveridge , 125 F.Supp.2d 634, 638 (E.D.N.Y. 2000) (Garaufis, J.) (citations omitted). "Under the Hague Convention, custody rights are defined as rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Pignoloni v. Gallagher , 12-CV-3305, 2012 WL 5904440, at *19 (E.D.N.Y. Nov. 25, 2012) (Matsumoto, J.) (quotation marks and citation omitted); Convention, art. 5. The sources of "rights of custody" are judicial or administrative decisions, legally binding agreements between the parties, and operation of the law of the state. Convention, art. 3; Pignoloni , 2012 WL 5904440, at * 19 (citation omitted). Regarding the third and final element, a petitioner must show "at the time of removal or retention those [custody] rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention, art. 3; Mota , 692 F.3d at 116-17.
"[O]nce a plaintiff establishes that removal was wrongful, the child must be returned unless the defendant can establish one of four defenses." Blondin I , 189 F.3d at 245 (citations omitted); 22 U.S.C. § 9001(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."). The first defense requires the respondent to show by clear and convincing evidence "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. § 9003(e)(2)(A). The second defense also requires the respondent to show by clear and convincing evidence "[t]he return of the child ... would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Convention, art. 20; 22 U.S.C. § 9003(e)(2)(A). The third defense, on the other hand, requires the respondent to show by a preponderance of the evidence that the proceeding seeking the child's return was commenced more than one year "from the date of the wrongful removal or retention" and "the child is now settled in its new environment." Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B). Finally, the *315 fourth defense requires the respondent to show by a preponderance of the evidence "the person, institution, or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B) ; see also Blondin I , 189 F.3d at 245-46 (providing overview of the defenses); A.A.M. v. J.L.R.C. , 840 F.Supp.2d 624, 632 (E.D.N.Y. 2012) (Weinstein, J.) (same).[11]
DISCUSSION
As discussed below, Petitioner fails to establish his prima facie case because Petitioner cannot show Respondent wrongfully removed NIR to or retained NIR in the United States in violation of his custodial rights under Hungarian law. But even if Petitioner could establish a case for wrongful removal or retention, his petition must still be denied because Respondent has satisfied her burden of establishing two applicable defenses: (1) there is a grave risk of harm to NIR if this Court ordered him "returned" to Hungary, and (2) NIR is now settled in the United States and this proceeding was commenced more than one year from the date of the alleged wrongful removal or retention.
I. Petitioner Fails to Establish His Prima Facie Case
Petitioner argues both Respondent's initial removal of NIR from Hungary to the United States in August 2015 and Respondent's continued retention of NIR in the United States after the Hungarian court declared Petitioner NIR's father violate his custody rights under Hungarian law. This Court first considers Petitioner's claim of wrongful removal and then his claim of wrongful retention. Neither claim has merit.
A. Wrongful Removal
Petitioner argues Respondent wrongfully removed NIR from Hungary, NIR's alleged place of habitual residence, and the removal was in breach of Petitioner's custody rights and the custody rights of the Hungarian court with jurisdiction over Petitioner's paternity proceedings. Pet.'s Post-Hr'g Br. at 4-11. Petitioner's claim fails because even if Petitioner could establish Hungary as NIR's place of habitual residence as of August 2015 (which he cannot, as discussed infra ), neither Petitioner nor the Hungarian court had any custody rights at the time of removal.
With respect to Petitioner's custodial rights, both Hungarian law experts testified that Petitioner had no parental or custody rights before the Hungarian court issued an order declaring Petitioner the father of NIR in June 2016 (which did not become final until September 2, 2016). Tr. 288:14-289:1, 349:10-23. Moreover, both experts testified the Hungarian court order at issue was not retroactive. Tr. 289:2-8, 351:13-352:2. Accordingly, in August 2015-when Respondent left Hungary with NIR-Petitioner did not have any custody rights under Hungarian law. Because Petitioner cannot show "the removal ... was in breach of [his] custody rights" under Hungarian law, Petitioner's claim of wrongful removal fails. Gitter , 396 F.3d at 131 (citation omitted).
*316 While not binding on this Court, the Seventh Circuit's decision in Redmond is instructive. In Redmond , the petitioner alleged the continued retention of the subject child in the United States was wrongful under the Hague Convention in light of an Irish court's order of joint custody, which was issued after the child had been living in the United States for several years. 724 F.3d at 731. In his petition, the petitioner had initially argued the removal of the child from Ireland to the United States in November 2007-more than three years before the Irish court granted his application for joint custody on February 10, 2011-was also wrongful. Id. at 738 & n.3.
Acknowledging the petitioner had since withdrawn his claim for wrongful removal, the court noted the petitioner "does not argue, nor could he, that [respondent's] move with [the child] from Ireland to Illinois in November 2007 was wrongful under the Hague Convention" because "[a]s of November 2007, when [respondent] moved with [the child] to the United States, [petitioner] had no custody rights to assert against [respondent's] removal of their son from Ireland; under Irish law he was not recognized as [the child's] legal guardian and had no right to direct the child's upbringing or decide where he would live." Id. at 738. Accordingly, even "[a]ssuming that Ireland was the child's habitual residence at that time, [respondent's] conduct was not wrongful under the Hague Convention." Id. at 738-39 (citing White v. White , 718 F.3d 300, 304-06 (4th Cir. 2013) ); see also Martinez v. Cahue , 826 F.3d 983, 990-92, 994 (7th Cir. 2016) (rejecting claim of wrongful removal when the child's mother, who had sole custody over the child, moved with the child from Illinois to Mexico because "she had sole custody over [the child] under Illinois law, and neither Illinois law nor the Convention precluded her from moving with her son to Mexico with or without [the father's] permission"), Here, like in Redmond , Petitioner had no custody rights over NIR when Respondent moved with NIR to the United States, and her conduct was not wrongful under the Hague Convention.
Petitioner also argues the Hungarian court in which Petitioner's paternity case was pending had a custody right over NIR which was violated by Respondent's move from Hungary to the United States in August 2015. Pet.'s Post-Hr'g Br. at 9-11. In support, Petitioner cites several decisions from foreign jurisdictions. Id. at 9-10. But the expert testimony in this case flatly rejected the argument that the Hungarian court, or a trustee appointed to represent the interests of the child, had any custodial rights with respect to NIR while the case was pending. Tr. 291:15-292:9. Although Petitioner contends the Hungarian court "would have refused to agree to [NIR's] removal" if Respondent had informed the court of her plans to permanently leave Hungary with NIR, Pet.'s Post-Hr'g Br. at 11, the evidence shows the Hungarian court was aware of Respondent's plans, yet did nothing. See Tr. 177:24-178:5, 261:12-25. At bottom, at the time of removal, neither Petitioner nor the Hungarian court had any custodial rights with respect to NIR, and Respondent did not violate Hungarian law by moving to the United States with NIR in August 2015. See Tr. 288:14-17. The removal of a child is considered wrongful only where "it is in breach of rights of custody attributed to a person, an institution or any other body." Gitter , 396 F.3d at 130 (quoting Convention, art. 3). Because Petitioner cannot show the removal violated his then non-existent custody rights or the purported custody rights of any other institution or body under Hungarian law, his claim of wrongful removal fails.
*317 B. Wrongful Retention
Petitioner argues that even if this Court finds Respondent's removal of NIR to the United States in August 2015 was not wrongful, Respondent has wrongfully retained NIR in the United States in violation of his custody rights. Pet.'s Post-Hr'g Br. at 11-15. Petitioner argues NIR's retention in the United States became wrongful "on the date that Petitioner's custody rights were confirmed," which Petitioner contends is sometime in early July 2016. Id. at 11-12. According to Petitioner, because he did not consent to NIR's continued retention in the United States, Respondent's continued retention of NIR became wrongful at that time. Id. at 12.
For Petitioner to prevail on his claim of wrongful retention, he must show NIR was a habitual resident of Hungary at the time he alleges Respondent's continued retention became wrongful. See, e.g., Mota , 692 F.3d at 113 ("[T]he child must have been removed to or retained in a Contracting State other than [the child's] State of habitual residence for the Convention to apply." (citation omitted) ). Indeed, Petitioner alleges Hungary was NIR's place of habitual residence "on the latest possible date the wrongful retention began" Pet.'s Post-Hr'g Br. at 12. As discussed supra , this Court finds Petitioner's paternal rights became final on September 2, 2016. Accordingly, Petitioner's claim of wrongful retention turns on the determination of NIR's habitual residence immediately prior to September 2, 2016, when the Hungarian court order became final and when Petitioner alleges the retention of NIR in the United States became wrongful.
Under Gitter , the first step in determining habitual residence under the Convention is to look into the intent "of those entitled to fix the child's residence." Gitter , 396 F.3d at 134. When Respondent moved with NIR to the United States in August 2015, Petitioner had not been confirmed as NIR's father and was not entitled to fix NIR's residence. See Redmond , 724 F.3d at 747 (finding respondent, who had sole custody of the child at issue, had the "exclusive right to fix the place of [the child's] residence"). As a result, only Respondent's intent is relevant. She testified she always intended to raise NIR in New York and never intended to raise NIR in Hungary. See Tr. 170:19-23,203:19-204:4,225:6-8. Her intent is supported by evidence in the record, including her marriage to a U.S. citizen, the fact that she and NIR are both lawful permanent residents, and the fact that she has not left New York since arriving. Accordingly, Respondent's physical move to the United States with NIR, coupled with her intent to raise NIR in New York, establishes that as of September 2, 2016-when the Hungarian court's order became final-the United States had already been established as NIR's habitual residence. Petitioner's claim of wrongful retention fails because Petitioner cannot show NIR has been wrongfully retained in a country other than his place of habitual residence, which is the United States.
Although it is not necessary to consider Petitioner's intent because he did not have any custodial or parental rights prior to September 2, 2016 and was not entitled to fix NIR's residence before that date, even if this Court considers his intent, his claim of wrongful retention still fails. The parties' testimony makes clear they never shared an intent regarding where NIR would be raised, and their relationship had broken down by the time of NIR's birth in September 2014. Although Petitioner testified they planned to raise NIR together in Hungary and made preparations for NIR's arrival, see Tr. 20:10-22:12, and further asserts he and Respondent always intended to raise NIR in Hungary, see Pet.'s Post-Hr'g Br. at 12-13, Respondent testified *318 she always intended to raise NIR in New York and never intended to raise NIR in Hungary, see Tr. 170:19-23, 225:6-8. By the time of NIR's birth in September 2014, Respondent and Petitioner no longer lived together; Respondent had been living with her mother for several months after moving out from living with Petitioner. Approximately a month before NIR's birth, Petitioner drunkenly threw a rock through the window of the building where Respondent was residing at the time.
Courts have recognized the difficulty of determining habitual residence in cases involving young children where, like here, the parties' relationship breaks down prior to or right after the birth of the child. In discussing habitual residence in the case of young children, the Third Circuit has observed:
Where a matrimonial home exists, i.e., where both parents share a settled intent to reside, determining the habitual residence of an infant presents no particular problem, it simply calls for application of the analysis under the Convention with which courts have become familiar. Where the parents' relationship has broken down, however, as in this case, the character of the problem changes. Of course, the mere fact that conflict has developed between the parents does not ipso facto disestablish a child's habitual residence, once it has come into existence. But where the conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence.
Delvoye , 329 F.3d at 333 ; see also In re A.L.C. , 607 F. App'x 658, 662-63 (9th Cir. 2015) ("When a child is born under a cloud of disagreement between parents over the child's habitual residence, and a child remains of a tender age in which contacts outside the immediate home cannot practically develop into deep-rooted ties, a child remains without a habitual residence because if an attachment to a State does not exist, it should hardly be invented." (quotation marks and citations omitted) ); Kijowska , 463 F.3d at 587 ("The cases speak of the 'shared intent' of the parents, but that formula does not work when as in this case the parents are estranged essentially from the outset, the birth of the child (or indeed before)." (citations omitted) ); Aly v. Aden , 12-CV-1960, 2013 WL 593420, at *13 (D. Minn. Feb. 14, 2013) ("In cases where the parents lack a settled intent to reside together at the time of the child's birth, the infant may not acquire a habitual residence in the country in which she is born." (footnote omitted) ).
Petitioner argues it is "absurd" to suggest Hungary was not established as NIR's place of habitual residence. See Pet.'s Post-Hr'g Reply Br. at 4. This Court disagrees. Given the lack of shared intent and the breakdown of the parties' relationship prior to NIR's birth, the Court concludes Hungary was never established as NIR's place of habitual residence. See, e.g., In re A.L.C. , 607 F. App'x at 662-63 (concluding the child's "nine months as an infant in Los Angeles do not result in [the child] acquiring habitual residence in the United States" given lack of shared parental intent). Although Petitioner emphasizes the determination of the Hungarian court that NIR was a habitual resident of Hungary, see Pet.'s Pre-Hr'g Reply Br. at 3; Pet.'s Post-Hr'g Br. at 5, 15, the Hungarian court was not deciding habitual residence under the Convention and was not applying the applicable standards for determining habitual residence under the Convention. Petitioner cites Duran-Peralta to support his argument that Hungary was NIR's place of habitual residence, stating the court in that case found the child at issue was habitually resident in the Dominican Republic after living there for only two months after birth and noting the *319 child had never lived anywhere else before the removal. Pet.'s Post-Hr'g Reply Br. at 5 (citing Duran-Peralta , 2017 WL 6596632, at *7 ). But in Duran-Peralta -unlike the instant case, where there was no shared intent-"the parties shared an initial intent that [the child] reside in the Dominican Republic." Duran-Peralta , 2017 WL 6596632, at *7. At bottom, Petitioner has failed to establish that NIR-who was less than one year old when Respondent moved with him to the United States in August 2015-was ever habitually resident in Hungary given the lack of shared intent to raise NIR there, the breakdown of the parties' relationship prior to NIR's birth, and NIR's presumed inability to form meaningful connections as an infant before leaving. Accordingly, even when this Court considers evidence of Petitioner's stated intent to raise NIR in Hungary, Petitioner's claim of wrongful retention still fails.
"A petitioner cannot invoke the protection of the Hague Convention unless the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in a different State." Gitter , 396 F.3d at 130. As the Seventh Circuit observed, "a parent may not use the Convention to alter the child's residential status based on a legal development in the parent's favor." Redmond , 724 F.3d at 742. By the time the Hungarian court's order declaring Petitioner the father of NIR became final on September 2, 2016, Respondent and NIR had been living in the United States for over a year-more than half of NIR's life-and NIR's place of habitual residence had been established as the United States, for the reasons already described. Petitioner cannot escape the reality that Respondent acted lawfully in taking NIR to the United States and establishing his place of habitual residence as New York, and he cannot use the Hungarian court's order to require NIR's return to Hungary. Accordingly, Petitioner's claim of wrongful retention is without merit.[12]
II. Applicable Defenses
Even if Petitioner could establish his prima facie case (which he cannot), his petition must still be denied because Respondent has established the applicability of two defenses: (1) the "grave risk of *320 harm" defense, and (2) the "well-settled" defense. The Court now addresses these two defenses.
A. Grave Risk of Harm
Pursuant to Article 13(b) of the Hague Convention, a court need not order the return of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). Respondent must establish this exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A) ; Souratgar v. Lee , 720 F.3d 96, 103 (2d Cir. 2013) (citation omitted). "Subsidiary facts may be proven by a preponderance of the evidence." Souratgar , 720 F.3d at 103 (citation omitted). The Second Circuit has explained:
[A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.
Blondin v. Dubois , 238 F.3d 153, 162 (2d Cir. 2001) (" Blondin II "). "Under Article 13(b), a grave risk of harm from repatriation arises ... in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason , may be incapable or unwilling to give the child adequate protection." Souratgar , 720 F.3d at 103 (quotation marks and citation omitted). "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high. The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." Id. (quotation marks, citation, and alterations omitted).
Although "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk," the Second Circuit has recognized that "[e]vidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse." Id. at 104 (quotation marks, citation, and alterations omitted); see also Ermini v. Vittori , 758 F.3d 153, 164-65 (2d Cir. 2014) (noting spousal abuse can establish a grave risk of harm to the child in certs in circumstances). In Davies v. Davies , the Second Circuit affirmed the district court's conclusion that ordering the return of the child would "expose him to a grave risk of psychological harm" based on, inter alia , the petitioner's psychological abuse of the respondent over many years (some of which was witnessed by the child) and the petitioner's "extreme violence and uncontrollable anger." 717 F. App'x 43, 48-49 (2d Cir. 2017). Moreover, courts have recognized exposing children to inappropriate sexual concepts at a young age can constitute psychological abuse. See Sabogal v. Velarde , 106 F.Supp.3d 689, 705 (D. Md. 2015) (noting "the reckless exposure of the Children to inappropriate sexual concepts at a young age" contributed to "tak[ing] [the petitioner's] psychological abuse to a level beyond what is typically seen in grave risk cases"); Neves v. Neves , 637 F.Supp.2d 322, 337 (W.D.N.C. 2009) ("There can be no doubt that the exposure of young children to photographs of nude adults, particularly in a sexual context, can present problems to *321 the children's psychological development.").
Here, the Court finds Respondent has met her high burden of showing by clear and convincing evidence there is a grave risk of harm to NIR if he were; sent back to Hungary. As already described in detail, Petitioner has engaged in a prolonged course of physical, sexual, and emotional abuse of Respondent. Petitioner admitted to physically assaulting Respondent on more than one occasion, and his physical abuse includes one incident in which he nearly choked her to death. Petitioner has threatened to kill Respondent. Among other insults Petitioner directed at Respondent during the August 20, 2014 incident, Petitioner stated, "I'm coming back in the morning, and I'm gonna whack your head to pieces!" Ex. G at HERRERA_0000274_T at 6:57. Petitioner's threats have continued since Respondent has been in New York. Petitioner consistently pressured Respondent into engaging in sexual activity with other men-including by encouraging her to take drugs-and filmed several of these encounters, which he later uploaded to YouTube. When Respondent, who had never had sex before meeting Petitioner, initially refused Petitioner's demands, Petitioner verbally degraded her and called her a "fake actress bitch." Petitioner sent screenshots of these sexual encounters to Respondent's father and has engaged in a campaign of online harassment of Respondent using sexual images from the videos he filmed. Petitioner forced Respondent to watch the videos he filmed while they had sex as punishment for being a "nasty bitch."
Far from being sporadic or isolated incidents, the evidence shows Petitioner has subjected Respondent to repeated abuse over the course of many years. Dr. Cling testified Respondent was "very credible, psychologically speaking," and she determined Respondent suffers from PTSD as a result of Petitioner's abuse. Tr. 311:22-23; Ex. BN at 9 ("[Respondent] still suffers from some symptoms of PTSD related to the domestic violence she experienced."). Dr. Cling explained there is an "extreme risk" Petitioner's abuse of Respondent would continue and perhaps intensify if she returned to Hungary, and "[a]s a perpetrator of domestic violence with a clear obsession with controlling [Respondent], [Petitioner] is psychologically extremely likely to continue to harass and abuse her."[13] Ex. BN at 9; Tr. 314:6-14. As a result, Dr. Cling stated "[w]ere NIR to witness first-hand the type of abuse that [Petitioner] has inflicted on his mother in the past, NIR would face a substantial risk of developing psychological symptomatology," a risk which was "reinforced by the close bond NIR shares with [Respondent] as his sole caretaker." Ex. BN at 9; see also id. at 8 ("Observing this harassment and abuse would expose NIR to psychological harm."). Dr. Cling testified it would be "very harmful to NIR" if he witnessed the abuse, Tr. 314:10-15, and testified there is empirical evidence suggesting that for children who witness their mother being abused, "it is like direct child abuse of them, so that's very serious," Tr. 315:2-8. In addition to the dangers of viewing first-hand Petitioner's abuse of Respondent, Dr. Cling also testified regarding the potential of abuse of NIR directly. She testified that *322 perpetrators of domestic violence are more likely to become child abusers.[14] Tr. 315:9-17, 325:11-13. Dr. Cling noted "the two incidents where [Petitioner] accosted [Respondent] when she was holding NIR as an infant, which is an indicator of a certain disregard of the child" also had some bearing on her assessment of the risk of harm to NIR. Tr. 331:10-20.
Taking into account Petitioner's long history of abuse of Respondent and Dr. Cling's unrebutted expert testimony regarding the likelihood of continued abuse and harmful psychological effects NIR is likely to experience were he to witness the abuse, this Court finds Respondent has demonstrated by clear and convincing evidence that there is a grave risk of harm to NIR if this Court granted the petition. Petitioner argues Respondent fails to establish a grave risk of harm because, among other reasons, there is no evidence NIR was present for or witnessed any of Petitioner's prior abuse of Respondent. See Pet.'s Post-Hr'g Reply Br. at 9. But this argument is misleading because a substantial portion of Petitioner's prior abuse occurred before NIR's birth and the parties were no longer living together or spending time together when NIR was born. On the small number of occasions when Petitioner has interacted with Respondent in NIR's presence, Respondent's testimony indicates Petitioner acted aggressively and was drunk. It would be disingenuous to attempt to minimize the risk of harm to NIR by arguing there is no evidence NIR witnessed past abuse. Although the grave risk of psychological harm to NIR from witnessing the abuse of his mother is enough to establish the applicability of the defense, Dr. Cling's testimony regarding the potential for physical abuse of NIR further supports this conclusion. In addition, Petitioner has threatened to show NIR sexually explicit images of Respondent; indeed, Respondent testified regarding her fear that Petitioner would show NIR the sexually explicit videos. Tr. 263:14-23; Ex. C. at HERRERA_0000103_T. This lends further support to the conclusion that there is a grave risk of harm. See Sabogal , 106 F.Supp.3d at 705 ; Neves , 637 F.Supp.2d at 337.
This Court must also consider whether there are any "ameliorative measures" that might mitigate the grave risk of harm NIR faces if he were sent back to Hungary. See Blondin I , 189 F.3d at 249 ; Kosewski v. Michalowska , 15-CV-928, 2015 WL 5999389, at *17 (E.D.N.Y. Oct. 14, 2015) (Matsumoto, J.) (citations omitted). "A court may decline to repatriate a child ... where it finds that there are no ameliorative measures that could be put in place that would significantly mitigate the grave risk to the child." Reyes Olguin v. Cruz Santana , 03-CV-6299, 2005 WL 67094, at *10 (E.D.N.Y. Jan. 13, 2005) (Gleeson, J.) (citations omitted). Petitioner argues "Hungary provides ample protection for children and adults from domestic violence and other abuse" and "Hungary has a fully competent legal system that can and does litigate domestic disputes and offers protections for abused children." Pet.'s Post-Hr'g *323 Br. at 20; see also Pet.'s Post-Hr'g Reply Br. at 10. This, however, is not enough. See, e.g., Van De Sande v. Van De Sande , 431 F.3d 567, 571 (7th Cir. 2005) ("The rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned ...."); Reyes Olguin , 2005 WL 67094, at *12 (rejecting arrangements "in the abstract" that might mitigate against the risk of repatriation because those arrangements would not be available on the facts of the case).
The evidence shows the protections available under Hungarian law are not enough to mitigate against the grave risk of harm. Respondent made multiple reports to the police about Petitioner but was unable to get a protective order because they no longer lived in the same apartment. Tr. 264:18-265:13; see also Tr. 52:17-53:7. Even more troubling, Petitioner testified he has a "really good relation" with a police commander who "brought [Petitioner] a very big folder with documents" related to Respondent's complaints to the police. Tr. 122:20-123:25. Moreover, Petitioner has not proposed any ameliorative measures. See Reyes Olguin , 2005 WL 67094, at *12 (finding no ameliorative measures to mitigate grave risk of harm in part because the petitioner "has not offered to take any action that might help reduce the risks of repatriation" (citation omitted) ). Even if Respondent were able to obtain some kind of protection against Petitioner, this Court has no confidence Petitioner would abide by any protective measures considering his prior conduct, which includes a sentence of 47 days in jail for resistance to authority. See Tr. 117:11-119:2; Davies , 717 F. App'x at 49 (considering petitioner's past behavior in evaluating whether petitioner would abide by ameliorative measures). Accordingly, this Court concludes there are no ameliorative measures that could significantly mitigate the grave risk of harm to NIR.
B. Well-Settled Defense
The well-settled defense requires a respondent to show by a preponderance of the evidence that the proceeding seeking the child's return was commenced more than one year "from the date of the wrongful removal or retention" and "the child is now settled in its new environment."[15] Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B). "[I]f more than one year has passed [since the date of wrongful removal or retention], a 'demonstra[tion] that the child is now settled in its new environment' may be a sufficient ground for refusing to order repatriation." Blondin II , 238 F.3d at 164 (quoting Convention, art. 12). "[T]he now 'settled' exception only applies where the child has been in the destination state for more than one year from the date of the wrongful removal or retention." Hofmann , 716 F.3d at 295 ; Kosewski , 2015 WL 5999389, at *18 ("Article 12 permits a judicial or administrative authority to refuse to order the repatriation of a child on the sole ground that the child is settled in his or her new environment, if more than one year has elapsed between *324 the abduction and the petition for return."). Although "[n]either the Convention nor ICARA defines 'settled' or states how a child's settlement is to be proved," the Second Circuit has explained " 'settled' should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." Lozano v. Alvarez , 697 F.3d 41, 56 (2d Cir. 2012) (citation omitted), aff'd sub nom. Lozano v. Monioya Alvarez , 572 U.S. 1, 134 S.Ct. 1224, 188 L.Ed.2d 200 (2014). The following factors are generally relevant:
(1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.
Id. at 57 (citations omitted); In re D.T.J. , 956 F.Supp.2d 523, 534 (S.D.N.Y. 2013) (Engelmayer, J.); In re Koc , 181 F.Supp.2d 136, 152 (E.D.N.Y. 2001) (Pollak, M.J.).
"The ICARA provides that the 'commencement of proceedings,' as used in Article 12 of the Convention, does not occur until a person files a petition in a civil action for the return of the child in a court that has jurisdiction in the place where the child is located at the time the petition is filed." Lozano , 697 F.3d at 51 n.9 (quotation marks omitted) (citing 42 U.S.C. §§ 11603(b), (f)(3), now codified at 22 U.S.C. §§ 9003(b), (f)(3) ); see Matovski v. Matovski , 06-CV-4259, 2007 WL 2600862, at *10 (S.D.N.Y. Aug. 31, 2007) (Castel, J.) (establishing the date of commencement of proceedings for the purpose of calculating the one-year period as "the date on which the petition was filed"); Taveras v. Morales , 22 F.Supp.3d 219, 233 (S.D.N.Y. 2014) (Abrams, J.) ("The parties agree that the instant Petition was filed on October 31, 2013, and that the one-year period described in Article 12 is measured from this date. Whether the 'now-settled' defense is available therefore turns on whether the retention became 'wrongful' before October 31, 2012." (citations omitted) ), aff'd sub nom. Taveras ex rel. L.A.H. v. Morales , 604 F. App'x 55 (2d Cir. 2015) ; see also Wojcik v. Wojcik , 959 F.Supp. 413, 418-20 (E.D. Mich. 1997) (considering and rejecting the petitioner's argument that filing an application with the Hague Convention Central Authority of the United States constituted commencement of the proceedings for purposes of Article 12).
Here, Respondent moved with NIR to the United States on August 25, 2015, and the petition was filed on May 1, 2018, see Petition, ECF No. 1. There is no question the petition was filed more than one year after NIR's removal. Moreover, as already discussed, Petitioner alleges Respondent's continued retention of NIR became wrongful, at the latest, when the Hungarian court order declaring Petitioner NIR's father became final, see Pet.'s Post-Hr'g Br. at 11-12, which this Court has determined to be September 2, 2016-also more than one year from the date Petitioner filed his petition. Accordingly, the "well-settled" defense is available to Respondent. Having established its availability, this Court now considers whether NIR is now settled in the United States.
NIR is now approximately four years old. "While the age of the abducted child is a factor to be considered, courts are not in total agreement as to the existence of a correlation between age and degree of settlement." Broca v. Giron , 11-CV-5818, 2013 WL 867276, at *6 (E.D.N.Y. Mar. 7, 2013)
*325 (Johnson, J.), aff'd , 530 F. App'x 46 (2d Cir. 2013). Petitioner asserts "the well-settled defense is inapplicable to young children" because they are too young to allow meaningful connections to their new environment to evolve. Pet.'s Post-Hr'g Br. at 20 n.32 (citing Cunningham v. Cunningham , 237 F.Supp.3d 1246, 1284 (M.D. Fla. 2017) ). In Cunningham , the court held an eighteen-month-old child was not well-settled and observed, "Respondents do not cite the Court to any authority in which a court has found that a child under the age of two years old was well-settled in her new environment." Cunningham , 237 F.Supp.3d at 1282. In another case that considered the well-settled defense for young children, the court noted the age of a two-and-a-half year old child was "not determinative." Ramirez v. Buyauskas , 11-CV-6411, 2012 WL 606746, at *6, *17 (E.D. Pa. Feb. 24, 2012) In any event, NIR is older than the child at issue in Cunningham . This Court finds NIR's age is not determinative and rejects Petitioner's categorical assertion that the well-settled defense is inapplicable to children of NIR's age.
Respondent and NIR have lived in New York since August 2015 and have not left since arriving. Tr. 203:19-204:4. Although Respondent and NIR have lived in several different residences since coming to the United States, all of those residences were in New York City. See Tr. 204:2-4, 204:23-205:6; Resp.'s R & O at 5. Notably, they spent the majority of their time at one address (the apartment of Mr. Herrera), and with the exception of their current residence, they lived at the other residences for only a few weeks immediately after arriving in the United States. See Resp.'s R & O at 5; Tr. 204:23-205:6, 206:5-14. Respondent and NIR now live in a family center where they are permitted to remain for one year. See Tr. 221:1-17, 251:24-25. Respondent described their current living arrangement as a large room with a private bathroom and kitchenette and stated she feels "safe and secure" in their current residence. Tr. 221:3-14.
NIR is enrolled in kindergarten and is excited to attend school. Tr. 222:7-24, 257:21-22; Ex. BD. Respondent is not currently employed, although she receives money from her father who supports her financially. Tr. 204:15-22, 250:17-24. Respondent's father now sends $1,000.00 on a monthly basis, which Respondent uses to support herself and NIR. Tr. 204:21-22, 266:2-10; Resp.'s R & O at 6. Respondent testified she plans to finish her studies and/or attend school for cosmetology and hairdressing. Tr. 223:2-4. NIR has friends in New York and loves New York. Tr. 222:3-4, 257:16-20. NIR's primary language is English; he speaks only a "few words" of Hungarian. Tr. 221:20-23. Respondent and NIR are both permanent residents of the United States, having applied in August 2016. Tr. 209:6-8, 210:5-13, 219:15-17, 220:5-7; Ex. AH; Ex. AK. NIR has health insurance through Medicaid. Tr. 211:9-12. Dr. Cling testified that based on her evaluation of NIR, he seemed "very well adjusted" in the United States. Tr. 321:13-18; see also Ex. BN at 8. Dr. Cling testified her assessment was based on her observation that NIR "seemed comfortable and happy," "was very comfortable in English," "was very familiar with all the cultural references that boys his age would have," and was looking forward to attending school. Tr. 321:23-322:25.
On balance, Respondent has shown by a preponderance of the evidence that NIR is now settled in the United States. While not every one of the factors previously described supports this conclusion, even those that do not-such as the number of prior residences in the United States and Respondent's lack of employment-do not dictate a contrary result.
*326 NIR has now lived in the United States, specifically New York, for approximately three quarters of his life. See Diaz Arboleda v. Arenas , 311 F.Supp.2d 336, 340, 343 (E.D.N.Y. 2004) (Garaufis, J.) (finding the children at issue well-settled in part because they "have lived in the New York area during the entire period they have lived in the United States" even though they lived at multiple addresses). NIR is a permanent resident of this country, has friends, speaks English, and attends school. Although Respondent is unemployed, her father sends her money every month, and she does not need to pay for her current living arrangements. Tr. 251:22-23; see In re D. T.J. , 956 F.Supp.2d at 536-37 (although the respondent was unemployed, evidence of financial support for the child at issue from other sources led to the conclusion that "this factor ... points in conflicting directions as to the 'settled' defense"). Taking into account all of the evidence-including the expert testimony of Dr. Cling, who testified NIR is "very well adjusted"-this Court concludes NIR is now settled in the United States.[16]
CONCLUSION
For the reasons discussed, Petitioner fails to carry his burden of showing wrongful removal or retention, and even if he could, Respondent has met her burden of establishing two defenses. The petition is DENIED.
SO ORDERED.

Although the case caption indicates Respondent's name is "Isabella Sofia Rippa," Rippa was her maiden name and after moving to the United States, she married and changed her name. Resp.'s Pre-Hr'g Br. at 1 n.1, ECF No. 24.

Although Petitioner's letter states the U.S. Marshals served Respondent on May 17, 2018, the certificate of service, ECF No. 13, indicates the U.S. Marshals served Respondent on May 16, 2018.

On July 24, 2018, this Court so-ordered the parties' joint stipulation regarding remote videoconference testimony pursuant to Federal Rule of Civil Procedure 43. ECF No. 38.

The Court draws its findings of fact from the testimony and exhibits admitted into evidence during the evidentiary hearing on July 24 and 25, 2018 and the parties' submissions.

Petitioner's testimony indicates he was already aware Respondent had a prior abortion in Italy, Tr. 26:3-17, but that prior abortion played at least some part in their argument.

Respondent clarified that although her jealousy of Petitioner's attention to other women played a role in her decision to leave, her decision was also motivated by her belief that Petitioner had "destroyed [her] life" and her fear that Petitioner would show NIR the sexually explicit videos of her. Tr. 241:25-242:5, 263:4-23.

A transcript of the March 18, 2015 Hungarian court proceedings corroborates Respondent's testimony that Petitioner behaved aggressively and received a warning from the judge. See Ex. A at HERRERA_0000005_T ("Attending Judge requests the plaintiff [Mr. Mohacsi] to keep the order of the hearing, if he does not do so, the Judge will issue a fine and call the security guards.").

Respondent stated her messages to Petitioner in April 2017 indicating she would return to Hungary and rent an apartment in Budapest were intended to calm Petitioner down and to find out if his threats about involving Interpol in returning Respondent to Hungary were real, and she did not actually intend to take NIR back to Hungary. Tr. 212:21-215:11, 248:23-249:9; Ex. 10. Respondent testified she did not want to send NIR back to Hungary at the time she was writing the messages and did not make any concrete plans to return to Hungary. Tr. 257:23-258:1, 258:12-21.

As discussed infra , both parties presented testimony from Hungarian law experts regarding the Hungarian court's decision, and based on those experts' testimony, this Court concludes the Hungarian court's decision did not become legally binding and final until September 2, 2016, even though Exhibit 4 bears the date June 16, 2016.

As noted previously, ICARA is now codified at 22 U.S.C. § 9001 et seq.

"In addition to these four exceptions, the Convention allows a court to take into account the preference of an older child," and a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Blondin I , 189 F.3d at 246 n.3 (quoting Convention, art. 13).

In light of the foregoing discussion, it is not necessary for this Court to analyze whether NIR has acclimatized to the United States. As the cases described supra indicate, there is some ambiguity regarding the applicable time period for the acclimatization analysis, especially considering the substantial period of time between the Hungarian court's order and the commencement of Petitioner's Hague Convention proceeding. See, e.g., Diorinou , 237 F.3d at 142 & n.10 ; Kijowska , 463 F.3d at 588-89. When considering the entire period of time during which NIR has lived in the United States, the evidence unequivocally points to the conclusion NIR has become acclimatized to New York. Whether NIR has become acclimatized when considering only his time in the United States until September 2, 2016-when the Hungarian court's order became final and when the continued retention of NIR is alleged to have become wrongful-is a closer question, but the evidence still shows NIR had become acclimatized in this shorter timeframe. By September 2016, NIR had lived in the United States for more than half of his life and had a pending application to be a lawful permanent resident. Petitioner argues NIR's life in the United States during this period of time was unstable because, among other reasons, "NIR lived in three different homes," which Petitioner argues cuts against a determination that NIR acclimatized to the United States. See Pet.'s Post-Hr'g Br. at 3. Although Respondent and NIR lived at several different addresses during that timeframe, all of these residences were in New York City and they spent the majority of this time at one address, with only a few weeks at the other addresses. See Tr. 204:2-4, 204:23-205:6; Ex. A to Decl. of Brent L. Andrus in Supp. of Pet.'s Pre-Hr'g Reply Br. ("Resp.'s R & O") at 5, ECF No. 30-1.

As noted in this Court's Findings of Fact, Dr. Cling explained her assessment of the probability of Petitioner's future abuse towards Respondent was based on several psychological risk factors, including that "a perpetrator who is generally obsessed with control increases [his] attempts when the victim flees or attempts to escape," and "speaking statistically, [Petitioner is] likely to be an abuser in the future and also likely to abuse his child." Tr. 324:7-325:13.

Petitioner asserts there is no evidence he has abused his other children and states he has a "positive relationship" with his ex-partner, Ms. Arnoth, the mother of his other children. Pet.'s Post-Hr'g Br. at 19 & n.31. As support, Petitioner cites two written statements by Ms. Arnoth. See Ex. 17; Ex. 27. However, Petitioner obtained at least one of these statements by threatening Ms. Arnoth. See Ex. BH at HERRERA_0000819 - 0000828_T at 0:31 ("If you don't make amends you are finished!"); see also id. at 23:03 ("[W]rite down you bastard that I never laid a finger on my children!"). The text exchange between Petitioner and Ms. Arnoth (Exhibit BH) casts substantial doubt on Petitioner's claim that he maintains a good relationship with Ms. Arnoth.

Specifically, Article 12 provides: "Where a child has been wrongfully removed or retained ... and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." Convention, art. 12. However, Article 12 clarifies that "where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, [the judicial or administrative authority] shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Id.

In support of his argument that the well-settled defense should not apply, Petitioner argues "Respondent's concealment of the wrongful removal contributed to the delay in filing the Petition." Pet.'s Post-Hr'g Br. at 20 n.32 (citing Lozano v. Montoya Alvarez , 572 U.S. 1, 19, 134 S.Ct. 1224, 188 L.Ed.2d 200 (2014) (Alito, J., concurring) ). Putting aside when Petitioner actually learned about the removal/retention (which was not later than March 30, 2017, see Ex. 5, still more than one year from the filing of his Petition on May 1, 2018), the Supreme Court held in the very case Petitioner cites that Article 12's one-year period is not subject to equitable tolling even when concealment is alleged. Lozano , 572 U.S. at 10, 15, 134 S.Ct. 1224 ("Without a presumption of equitable tolling, the Convention does not support extending the 1-year period during concealment."). To the extent Petitioner urges this Court to exercise its equitable discretion to order NIR's return despite finding NIR is now settled, Petitioner's delay in filing the petition in this Court even after he knew of NIR's location-coupled with the more than one year delay between the Hungarian court's order becoming final on September 2, 2016 and Petitioner completing and filing his "Request for return of a child wrongfully removed abroad" in October 2017, see Ex 6 & Petition at 5-counsels this Court against doing so. See, e.g., Matovski , 2007 WL 2600862 at *13 (even if equitable tolling were available, "this would be a poor case for its application .... [because] this petition would still have been filed more than one year after petitioner knew or should have known of the children's wrongful removal").